[No. E041445. Fourth Dist., Div. Two. Jan. 18, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ROBERT POWER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A, II.B, and II.D.

128

**COUNSEL**

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and David Delgado-Rucci, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHLI, J.**—This is not your garden-variety kidnapping and rape case.

Victim Jane Doe received a series of anonymous letters ordering her to engage in graphically detailed sex acts with defendant Michael Robert Power, her friend and coworker; if she did not, the letterwriter would "fuck [her]

family up." (Capitalization omitted.) Some of the letters also demanded money. Defendant managed to convince the victim that the sender was another coworker named Tiffany; he explained that Tiffany was "psycho" and that she had a grudge against the victim and wanted to humiliate her. He claimed that he was receiving similar letters. As a result, over a period of seven months, defendant repeatedly had sex with Jane Doe, against her will, and accepted money from her, claiming that he would deliver it to Tiffany.

As the letters grew increasingly angry, demanding, and pornographic, the victim became suicidal. Finally, when defendant made the mistake of going away on vacation, she went to the police. Unlike the victim, the police suspected defendant immediately. At first, defendant insisted that he and Jane Doe were both the victims of the anonymous letterwriter. Eventually, however, he admitted that he had been writing the letters because he wanted to have sex with Jane Doe.

Defendant was convicted on eight counts of kidnapping for purposes of a sexual offense (Pen. Code, § 209, subd. (b)(1)), eight counts of forcible rape (Pen. Code, § 261, subd. (a)(2)), eight counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)), and eight counts of extortion (Pen. Code, § 518) and was sentenced to a total of eight consecutive life terms plus 72 years in prison.

In the published portion of this opinion, we will hold that there was sufficient evidence that the movement of the victim was induced by force or fear, and also sufficient evidence that it increased the risk of harm and was more than merely incidental to the underlying offense, to support the convictions of kidnapping for purposes of a sexual offense.

In the unpublished portion of this opinion, we will hold that the manner in which the trial court imposed upper term sentences violated the Sixth Amendment. We will further hold that the imposition of unstayed sentences for kidnapping for purposes of a sexual offense as well as for forcible oral copulation did not violate Penal Code section 654. We will reject all of defendant's other contentions. Accordingly, we will affirm the judgment with respect to conviction, reverse the judgment with respect to sentence, and remand for resentencing.

I

## STATEMENT OF FACTS

### A. *Background.*

Defendant and victim Jane Doe[1] both had clerical jobs in the same office in Riverside. Jane considered defendant to be her closest friend.

Defendant was married. Jane was also married but having marital problems. In June 2004, Jane began having an affair with Lance, a coworker. Defendant could tell "there was an interest there"; this seemed to upset him, and he cautioned Jane to "take things slow."

### B. *Letters: June 2004 Through October 2004.*

Also in June 2004, Jane started getting anonymous letters. These were left on her desk or in her mailbox at work. They said, "[Y]ou better stop, Lance is my boyfriend." They "[w]arned [her] that if [she] didn't leave Lance alone everybody would find out, they would tell [her] children, make [her] life miserable, everybody would know what a whore [she] was."

Jane threw the letters away. However, she told defendant about them. Defendant said he thought that a coworker named Tiffany was sending them. He explained that Tiffany was interested in Lance. He also said that Tiffany was "psycho." Lance agreed that Tiffany was "psycho" and might be the person sending the letters.

Jane went to her supervisor and asked for a transfer. When asked why, she stated that she had been receiving harassing letters. Her supervisor conducted an internal investigation but was unable to determine who was writing the letters.

Around September 2004, because of the letters, Jane broke up with Lance and reconciled with her husband. She did not tell her husband about the letters because she was scared and also because she "didn't want him to have to deal with any of that."

In September 2004, Jane received just one letter, saying "it was all done and over . . . ." It added, "I'm sorry . . . say sorry to Michael." After that, the letters stopped for a while.

---

[1] The trial court ordered that the victim be referred to as Jane Doe. (Pen. Code, § 293.5.) To further protect her privacy, we will refer to everyone else involved in the case, other than defendant, by first name only.

C. *Letters: November 2004.*

In November 2004, Jane received another letter. It said: "So are you scared right now? . . . You can do what I tell you too [*sic*] when I tell you to and how I tell you to and your family will not suffer. Or you can be the selfish bitch I know you are and let them suffer instead. I will tell [your husband] and your kids lies and make you look like a worthless slut. I am very creative and very evil when I'm mad. . . . Don't doubt me. I WILL FUCK YOUR FAMILY UP. I know what your husband looks like. . . . Scared? You better be. . . . I am going to make you do things you didn't want to do with Lance. . . . And if you think of . . . going to the police or . . . sending another investigator from work again YOU WILL BE SORRY. I will take your family from you and destroy your career. You will never be able to prove any-thing. . . . By the way your friend and his family is [*sic*] going to suffer too. He already got a letter. After reading this TEAR this letter up. Someone is watching you read this. If you think . . . about telling ANYONE about this letter you and them will PAY."

Once again, Jane told defendant about the letter. He told her that he, too, had received a letter, which said that he and Jane "had to go to Green Burrito and sit in his car and kiss [for] a certain time." Jane did not want to do it, but defendant "kept at [her]," saying, "Why don't you just do this so our families don't get harmed." The next day, he told her she had received another letter while she was out of the office, but Jane still refused. Finally, defendant claimed to have received yet another letter and "told [her] that this was [their] last chance." Accordingly, they went to the Green Burrito and kissed.

Jane did not go to the police because defendant objected, saying that that would put his family at risk; he would deny everything, and no one would believe her. Defendant sent her an e-mail saying, "If those letter [*sic*] ever get into ANYONE's hands and I get questioned, I will deny any knowledge of it."

D. *Letters: December 2004 Through June 2005.*

Starting in December 2004, instead of Jane receiving letters directly, defendant would tell her that he had received a letter for her. He showed her some of them, but they said that he was supposed to tear them up, so he always took them back. Other letters he just told her about.

In December 2004, defendant claimed to have received a letter saying that Jane had to pay $300. He told her to give him the money; he would give it to a "friend," who in turn would give it to Tiffany. When Jane told defendant that she had only $200, he said he would put in the other $100. Jane gave defendant the $200.

Also in December 2004, defendant showed Jane a letter he claimed to have received that said that they had to go to a motel and perform specified sexual acts for one hour. It added that, if they did not do as they were told, their families would suffer.

At first, they did not comply. However, they received another letter saying, "So you want to keep saying no huh? I guess you do want to be selfish and let your husband and family suffer. You better do what I say. I will fuck your husband up. . . . I want you raped of any dignity and to be treated like a whore. . . . You will fuck who I say and pay what I say. Or your family WILL suffer. Isn't fucking worth saving your family? Is there a price you can put on your family?" Jane then agreed to comply.

Defendant drove Jane to a motel on Alessandro Boulevard in Moreno Valley, where they engaged in sex acts as directed, including intercourse and oral copulation. Defendant assured Jane that they "were simply doing what [they] had to do to protect [their] families." Jane complied only because she was afraid that her husband and children would be physically harmed.

Defendant brought along a video camera. He explained that the letter had said that the sex acts had to be videotaped, so Tiffany would know that they had complied. He said he would give the video to his friend, who would give it to Tiffany.

Later, however, defendant said he had gotten a letter complaining that the video looked "stiff." It ordered them to "redo the motel." This time, Jane had to "look natural," "[a]s if [she] were enjoying it." Accordingly, in December 2004 or January 2005, they went to a motel in Riverside, where Jane complied.

Defendant continued to tell Jane that he had received similar letters. They ordered Jane and defendant to perform specified sexual acts for specified periods of time in specified locations. They explained that Jane was supposed "to be humiliated or to feel like a whore." The letters said that if defendant and Jane did not comply, their families would be harmed.

Jane "always resisted," but defendant would say, "[D]o you want to gamble? Is it worth risking your family?" He told her she had to do what the letters said "[i]f [she] wanted to keep [her] family from harm . . . ." Jane therefore complied solely out of fear that her husband and children would be physically harmed. Between January and May 2005, defendant and Jane engaged in at least one act of sexual intercourse and at least one act of oral copulation on at least eight occasions.

Almost all of these sex acts took place, as the letters directed, in defendant's car while it was parked at a cemetery near the office. All but one of the

sessions were videotaped. Defendant took the tapes; supposedly, he gave them to his friend, who gave them to Tiffany, who then passed them back to defendant so he could destroy them. Defendant would show Jane a bit of each tape, then destroy it in her presence. However, she had no way of knowing whether he had made copies.

Starting in January or February 2005, the letters ordered Jane to pay $75 every semimonthly pay period. She gave the money to defendant, who said he would give it to his friend, who would give it to Tiffany.

In February 2005, defendant claimed to have received a letter ordering him not to wear a condom during the sex acts, so he stopped doing so.

On one occasion in February 2005, defendant and Jane were not able to complete all of the sexual acts they had been ordered to perform. As a result, they were ordered to pay a "fine" of $150.

In April 2005, Jane was offered a promotion to a job as supervisor in the Perris office. Defendant told her that he had gotten a letter saying that she could not go to Perris unless she paid $5,000. When she said she did not have $5,000, defendant told her that instead, she would have to have sex "in the back of [her] Suburban, with the tailgate down in a public place . . . ." Rather than do that, she turned the promotion down.

In April 2005, defendant claimed to have received a letter ordering him and Jane to go back to the motel in Moreno Valley and videotape themselves performing specified sex acts. Jane managed to put this off by having defendant negotiate with the letterwriter, asking to "pa[y] to get out of it or do something else." For example, one letter said that defendant would have to "toss [Jane's] salad." Defendant told her this meant "to lick another individual's anus." When Jane refused, defendant told her that, as a "penalty," she had to pay $1,500 instead. She did so.

In June 2005, however, defendant claimed to have received a letter saying they could not put off going to the motel any longer. Jane therefore complied.[2] However, she felt that this incident was "[her] breaking point." She "became suicidal."

E. *The Police Investigation.*

On July 1, 2005, while defendant was on vacation, Jane finally contacted the police. She gave the police copies of five letters she had managed to copy.

---

[2] The letter dictating the sex acts to be performed in this session is one of the few letters of which Jane managed to keep a copy. It stated:

"You are wondering why I kept changing my mind. Let me put it straight. Because I can. You are mine . . . . I can do whatever the fuck I want. . . . So this is what I want. I want her to

Jane told the police that Tiffany was sending the letters and that defendant was also a victim. The police, however, immediately suspected that that was not actually the case.

On July 14, 2005, the police taped three phone calls that defendant made to Jane. In late June, Jane had been promoted to a job as supervisor in the Norco office. In the first phone call, defendant told Jane that he had gotten a letter saying that she had to quit the job in Norco and return to the Riverside office. It added that if she did not comply, Tiffany would "have [her] fired" and "take[] [her] family away from [her]." When Jane said, ". . . I will not risk my family . . . ," defendant replied, "That's what you're doing right now." Jane remained reluctant, so defendant said, "[R]ight now, you[r] job's in jeopardy and so is mine and so is your family and so is mine, okay?" Jane protested that she had "already paid out over $3000 . . . ." In reply, defendant claimed that he had paid "[a] lot more than that . . . ."

In the second call, defendant read Jane a letter that said,[3] "[Y]ou are very lucky. I was getting ready to fuck you up . . . . I don't think you are taking me seriously at all." It also said, "[Y]our family will be perfectly safe as long as you two keep on cooperating. . . . The day you or him decide to lie to me, not cooperate, or deceive me in any way[,] I will send [your husband] all the tapes of you and Mike . . . . On top of that, I will get those [*sic*] information to your kids."

In the third call, defendant said that Tiffany was insisting that they have videotaped sex in a motel room for three hours and pay $1,000. Jane said she did not have $1,000; defendant indicated that Tiffany would accept four hours of sex and $500 instead.

---

go down on you 3 times and swallow all 3 times. . . . Also I want you to fuck her from behind 3 times and cum in her. . . . Don't take off her panties all the way. Just pull it down to her knees or ankles.

". . . I want her to dress up like a slut when she gets there. . . . [G]o down on each other, have her do it erotically, using her tongue and licking your dick. Then I want her to fuck you by riding you both facing the camera. I want you to cum all in her. I want her to take charge there.

"Then take a shower. Go down on each other in the shower. When you guys come out, do more cuddling. Then have her hover over your face facing the camera then I want you to eat her out while she is hovering. Do this for at least 2–3 minutes. Use your fingers too. Then have her go down on you erotically. Then I want you to fuck her in 2 different positions second one being from behind and cum in her. . . . Make it romantic. Candles and under the blanket must be included somewhere. . . . Have her touch herself for at least a minute then you stick whatever you want in her then lick it and stick it back in and have her lick it. . . .

". . . [A]ll of it on 1 tape."

[3] Portions of this phone call were inaudible. However, the missing portions of the letter can be reconstructed from drafts that were found on defendant's home computer.

### F. *Defendant's Statements to the Police*

Later on July 14, 2005, defendant agreed to be interviewed by the police. At first, he denied having any sexual or romantic relationship with Jane. However, he confirmed that Jane had received anonymous letters calling her a "whore" and a "slut" because she was having an affair with Lance. Subsequent letters had threatened to tell her husband about the affair. Defendant admitted that they had said, "I'm going to fuck your family up if you don't do what I say . . . ."

Defendant said Jane had received one letter ordering her to have sex with him but claimed that had never happened. He admitted that she was "very upset" and worried about something happening to her or to her family. At one point, defendant said, she was suicidal.

When the police told defendant (falsely) that they were going to do DNA testing on semen found on Jane's underwear, he changed his story. He said that, since November or December 2004, he and Jane had both been receiving letters telling them to perform specified sexual acts, including sexual intercourse and oral copulation, for specified periods of time, either in a motel room or in a car at a cemetery. Later letters ordered them to videotape the sex acts. They complied because the letters "threatened harm" to his family and to Jane's family if they did not.

The letters had also demanded money as a penalty for noncompliance. Defendant claimed he himself had had to pay "a couple of thousand dollars . . . ." He gave the money to an unnamed "Hispanic male," who gave it to the blackmailer.

The police then told defendant (again, falsely) that they were wiretapping his phone calls. At that point, he admitted that he was writing the letters. He said he did it so he could have sex with Jane. He also admitted that Jane had paid him $2,000 to $3,000.

### G. *Defense Evidence.*

Lance testified that in January or February 2005, defendant showed him a video of defendant and Jane having sex in a hotel room. Jane appeared to be enjoying it. She did not seem coerced or afraid.

Douglas, who was Lance's brother as well as defendant's "best friend," testified that defendant also showed him one of the videos. In between sex acts, defendant and Jane "were just laying in the bed watching TV [and] holding each other." They appeared relaxed and "like they were a couple."

Adrian, another friend of defendant, also saw one of the videos. At the beginning, defendant and Jane were lying on a bed, fully clothed, watching TV and laughing. Jane initiated oral copulation, which was followed by sexual intercourse. Jane appeared to be "[i]nto it." At one point, she appeared to have an orgasm.

Arthur, a former employee of the same office, testified that in January or February 2005, he saw defendant getting out of Jane's car; Jane grabbed him, pulled him back in, and gave him a kiss, and as Arthur put it, "it wasn't like one you give your sister."

II

DISCUSSION

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *The Sufficiency of the Evidence of Aggravated Kidnapping.*

Defendant contends that there was insufficient evidence to support his convictions of kidnapping for purposes of a sexual offense. (Pen. Code, § 209, subd. (b)(1).) First, he argues that there was insufficient evidence that he effected the movement of the victim by force or fear. Second, he argues that there was insufficient evidence that the movement of the victim went beyond that merely incidental to, or increased the risk of harm to the victim over and above that necessarily present in, the intended underlying offense.

1. *Force or fear*

■ For kidnapping to be committed, "the victim's movement must be accomplished by force or any other means of instilling fear. . . . '. . . [A] taking is forcible if accomplished through fear.' [Citation.] . . . [T]he force used against the victim 'need not be physical. The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances.' [Citations.]" (*People v. Majors* (2004) 33 Cal.4th 321, 326–327 [14 Cal.Rptr.3d 870, 92 P.3d 360], quoting *People v. Hill* (2000) 23 Cal.4th 853, 856 & fn. 2 [98 Cal.Rptr.2d 254, 3 P.3d 898] and *People v. Stephenson* (1974) 10 Cal.3d 652, 660 [111 Cal.Rptr. 556, 517 P.2d 820].)

---

*See footnote, *ante*, page 126.

■ In the letters, defendant threatened to "fuck . . . up" Jane's husband and family. When Jane discussed the letters with defendant, he urged her to do what they said because that was the only way she could keep her family safe. Jane testified that she did not want to comply, but she did only because she was afraid that her husband and her children would be physically harmed. This was ample evidence that her movement was compelled by force and fear. Penal Code section 207, subdivision (a), defining kidnapping, refers to force or "*any other* means of instilling fear . . . ." (Italics added.) We see no reason why the fear cannot involve a threat to injure a family member of the victim, rather than the victim him- or herself. (Cf. Pen. Code, § 212, subd. 1 [fear required for robbery may consist of "fear of an unlawful injury to the person or property of the person robbed, or of any relative of his or member of his family"].)

Defendant argues that the threats and the movement were separated by a substantial amount of time. He cites no authority for the proposition that this is legally relevant. All that matters is that when Jane did move, she was acting out of fear induced by the threats.

Defendant also argues that Jane's movement was not compelled because she could have gone to the police or simply refused to comply. This is like saying that pointing a gun at a victim's head does not constitute force or fear because the victim could refuse to comply or could call for help—and be shot. There is no requirement that the victim test the kidnapper to see if he or she is bluffing. The letters specifically told Jane that if she refused to comply or if she went to the police, her family would suffer. She sincerely believed that if she did either, her family would be physically harmed. Defendant reinforced this belief by telling her that Tiffany was "psycho" and that complying with her demands was the only way to keep their families safe. We cannot say as a matter of law that Jane's fear was unreasonable under the circumstances.

> 2. *Movement that is not merely incidental and that substantially increases the risk of harm.*

■ Kidnapping for purposes of a sexual offense requires "movement of the victim [that] is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (Pen. Code, § 209, subd. (b)(2).)

The rationale for this requirement is that, given "the breadth of the statutory definition of kidnaping, . . . it 'could literally overrun several other crimes, notably robbery and rape, . . . since detention and sometimes confinement, against the will of the victim, frequently accompany these

crimes. . . . It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved into and left in another room or place.' " (*People v. Daniels* (1969) 71 Cal.2d 1119, 1135 [80 Cal.Rptr. 897, 459 P.2d 225], italics omitted, quoting *People v. Levy* (1965) 15 N.Y.2d 159, 164 [256 N.Y.S.2d 793, 204 N.E.2d 842].) Our Supreme Court concluded that "such incidental movements are not of the scope intended by the Legislature in prescribing the asportation element of the same crime." (*Daniels*, at p. 1134, fn. omitted.) The Legislature confirmed this view by codifying it in Penal Code section 209, subdivision (b)(2).

"Whether a forced movement of a rape victim . . . was merely incidental to the rape, and whether the movement substantially increased the risk of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases. . . . [T]he jury must 'consider[] the "*scope and nature*" of the movement,' as well as '*the context of the environment in which the movement occurred.*' [Citations.] This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment. Moreover, whether the victim's forced movement was merely incidental to the rape is necessarily connected to whether it substantially increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.' [Citation.]" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1151–1152 [47 Cal.Rptr.3d 575, 140 P.3d 866], quoting *People v. Rayford* (1994) 9 Cal.4th 1, 12 [36 Cal.Rptr.2d 317, 884 P.2d 1369].) The Supreme Court has "articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes. [Citation.]" (*Dominguez*, at p. 1152.)

In the vast majority of cases, the increased risk of harm to the victim is a risk of physical harm. However, this requirement can also be satisfied by a risk of mental, emotional, or psychological harm. (*People v. Nguyen* (2000) 22 Cal.4th 872, 874, 877–886 [95 Cal.Rptr.2d 178, 997 P.2d 493].)

Defendant mostly made Jane go to one of two places: a motel on Alessandro Boulevard in Moreno Valley or a cemetery some "two [or] three minutes away" from their office. In addition, one time he made her go to a motel in Riverside, and one time he made her go to a "little patch of field . . . maybe eight to ten miles . . . from the cemetery." However, because defendant was convicted on eight counts of aggravated kidnapping, and because there was sufficient evidence of at least eight incidents involving either the Moreno Valley motel or the cemetery, we focus on these two places.

■ Defendant inferably chose these locations for two reasons: First, they decreased the risk of detection; second, they made it easier for him to

videotape the proceedings. By so doing, defendant's choice of locations also increased the risk of psychological harm to Jane. The decreased risk of detection meant that defendant was free to demand longer sexual sessions, involving kinkier sex acts; by June 2005, in the final session at the Moreno Valley motel, he was insisting on specific costuming, lighting, and props. Although he may not have made such demands in earlier sessions, it was his choice of locations that made such demands possible. Moreover, the fact that he could videotape the sex acts increased the risk of psychological harm to Jane, because he could insist that she act natural and appear to be enjoying the coerced sex; moreover, she had to contemplate Tiffany viewing the tapes. Indeed, the use of videotape made the crimes possible; without it, "Tiffany" would have had no way of verifying that defendant and Jane were actually performing the sexual acts that "she" had demanded.

■ A movement that is substantial is not merely incidental to the underlying offense, even though it may have been intended solely to facilitate the commission of the underlying offense. (*In re Earley* (1975) 14 Cal.3d 122, 130 [120 Cal.Rptr. 881, 534 P.2d 721].) Moreover, the jury could reasonably find that the distance from the office to a cemetery that was two or three minutes away by car was substantial, particularly in light of the increased risk of harm. (See *People v. Rayford, supra,* 9 Cal.4th at p. 23 [105 feet]; *In re Earley,* at pp. 126, 129–133 [10 to 13 blocks]; *People v. Thornton* (1974) 11 Cal.3d 738, 767–768 [114 Cal.Rptr. 467, 523 P.2d 267] [movement of two victims one block and four blocks, respectively], disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) A fortiori, it could reasonably find that the distance from Riverside to Moreno Valley was substantial. Most movements that have been found to be insubstantial or merely incidental to the underlying crime have been within a building (*People v. Daniels, supra,* 71 Cal.2d at p. 1140; *People v. Hoard* (2002) 103 Cal.App.4th 599, 607 [126 Cal.Rptr.2d 855]), or within the premises of a business (*People v. Williams* (1970) 2 Cal.3d 894, 901–903 [88 Cal.Rptr. 208, 471 P.2d 1008]).

We therefore conclude that there was substantial evidence that the movements of the victim were not merely incidental to, and increased the risk of harm from, the underlying offenses.

D. *Sentencing issues*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

\*See footnote, *ante,* page 126.

## III

## DISPOSITION

The judgment with respect to conviction is affirmed. The judgment with respect to sentence is reversed, and the matter is remanded to the trial court for resentencing.

The errors asserted with respect to the abstract of judgment are moot.

Ramirez, P. J., and McKinster, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 30, 2008, S161278.