Filed 8/12/15  People v. Tristau CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B256387 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA394749) |
| v. | |
| ROBERT MICHAEL TRISTAU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr.  and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

This case arises from a home invasion robbery committed by Robert Michael Tristau and an accomplice[1] against two victims. A jury convicted Tristau of one count of first degree burglary with a person present (Pen. Code,[2] § 459; count 1), two counts of kidnapping for robbery (§ 209, subd. (b)(1); counts 2 and 3), two counts of robbery (§ 211; counts 4 and 8) and two counts of false imprisonment by violence (§ 236; counts 6 and 7). The jury found true the allegation Tristau personally used a firearm to commit the burglary, aggravated kidnappings and robberies (§ 12022.53, subd. (b)).[3] In a bifurcated proceeding, the trial court found true the allegation that Tristau had one prior conviction for a violent or serious felony under the three strikes law (§§ 667, subds. (b)-(i), 1170.12) and one prior serious felony conviction within the meaning of section 667, subdivision (a)(1). The court also found Tristau had served six separate prison terms for felonies (§ 667.5, subd. (b)). He was sentenced to state prison for two consecutive terms of 14 years to life (as second strike offenses) with the possibility of parole on counts 2 and 3, plus a determinate term of 25 years for the firearm use and prior serious felony enhancements. Sentence on the remaining counts was stayed pursuant to section 654, and the trial court dismissed the prior prison term enhancements. On appeal, Tristau challenges only the convictions of kidnapping for robbery (counts 2 and 3). Tristau claims the evidence was insufficient to support these convictions. We agree and reverse the judgment on those counts, and remand for resentencing.

---

[1]     Tristau's accomplice was not identified.

[2]     Statutory references are to the Penal Code, unless otherwise indicated.

[3]     The jury acquitted Tristau of one count of unlawfully driving or taking a vehicle (Veh. Code, § 10851) with a prior conviction (§ 666.5).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The People's Evidence*

On the afternoon of September 2, 2011, Paul Tsan and his 12-year-old brother Jimmy Zhou were inside their family home, when they heard knocking on the front door. The front door consisted of an outer metal screen door that was always locked and an inner wooden door that was closed at the time. In response to the knocking, the brothers opened the wooden door and, through the screen door, they could see Tristau. He was standing on the front porch and appeared to be wearing the uniform of a package delivery service. Tristau said he had a package to deliver and showed Tsan a manila envelope, bearing the name of Tsan's mother, and a return receipt for Tsan to sign. After Tsan signed the receipt, Tristau handed him the package and produced a revolver. Tsan immediately grabbed the gun, fearing that he and his brother were going to be shot. Tristau pulled on the gun, causing Tsan to lose his footing, and both men fell to the ground near the front step. As Tsan struggled to wrest the gun out of Tristau's hands, he yelled at Zhou to call the police. At some point, Tristau's accomplice[4] pulled Tsan off of Tristau. Tristau stood up, pointed the gun at Tsan, and ordered him into the house.

Zhou went to the living room and dialed 911 on the telephone. Before Zhou heard anyone answer the call, Tristau's accomplice took the telephone away from Zhou, and bound Zhou's hands behind his back with plastic zip ties.

Once inside the house, Tristau directed Tsan to lie prone on the living room floor, and he bound Tsan's hands behind his back with plastic zip ties. Tristau asked Tsan, "Where is the safe?" Tsan replied that there was no safe in the house. Tristau and his accomplice ordered Tsan and Zhou to get up and walk to a bathroom, approximately

---

[4]     Tsan testified he did not know where the accomplice came from. Zhou testified he did not see the accomplice when he and his brother answered the door. Zhou also testified the accomplice "came inside the house" while Tsan and Tristau were fighting for the gun. But how the accomplice entered the house was never explained.

three feet from where they were located in the living room. The bathroom shared a common wall with the living room. Zhou testified he and his brother were moved to the bathroom "pretty much" immediately after Zhou was zip-tied. Tsan testified they were moved to the bathroom a minute or two after he and his brother were zip-tied.

At this point, Tsan believed that he and Zhou were going to die. Tristau followed the brothers into the bathroom. Tristau assured them that they were not going to be hurt and left the bathroom. Tristau's accomplice immediately entered, closed the bathroom door, and watched over the brothers for approximately two minutes. Tsan and his brother were sitting on the floor of the bathroom with their hands behind their backs. The accomplice did not have any weapon on him. During this time, Tsan heard the sound of footsteps running throughout the house.

Tristau soon returned, replacing his accomplice inside the bathroom, and demanded that Tsan tell him where to find the safe. Tsan insisted there was no safe in the house as he again heard the sound of running footsteps. Tristau asked if the police had been called. When Tsan and Zhou said they had called police, Tristau walked out of the bathroom, once again closing the door, and screamed at his accomplice, "We don't have much time. We have to leave." The door of Tsan's parents' bedroom, which was across from the bathroom, was locked. Tsan heard the door being kicked open before Tristau came back and asked where Tsan's car keys were. Tsan told him the keys were on a table in his bedroom, and Tristau left. Tsan and Zhou waited another three minutes before they left the bathroom, cut off the zip ties and telephoned the police, who arrived shortly thereafter. Tsan's car was later found abandoned six blocks away from his home.

Tsan testified his home was a single family residence, measuring 1,300 square feet, with three bedrooms and one and one-half bathrooms. There were two windows fitted with awnings and bars at the front of the house; the left window fronted the kitchen and the right window fronted the living room. The front windows had exterior awnings which extended half-way down the windows. The windows also had interior coverings, but in the daytime the coverings were opened to let in light. When Tsan was asked

4

whether he believed that someone standing on the sidewalk could see into his house he answered, "I think so, yeah."

Tsan testified the bathroom in which he and his brother were held was located approximately three feet away from the living room, off a small hallway. Apart from the door into the hallway, the bathroom had a door that led to a laundry room, from which it was possible to exit the house. The door between the bathroom and the laundry room was closed on the day of the robberies. The bathroom had one window, which faced the side of the house and was fitted with bars and frosted glass. When the window was closed no one could see into or out of the bathroom. Tsan never tried to open the window and was uncertain whether it could be opened.

## B. *The Defense Motion To Dismiss*

At the close of the People's case, the trial court heard and denied Tristau's motion for judgment of acquittal (§ 1118.1) on the ground the People had not made a prima facie showing of asportation to prove the kidnapping for robbery counts.

## C. *The Defense Evidence*

Tristau neither testified nor presented other evidence in his defense.

## DISCUSSION

## A. *Standard of Review*

In considering a challenge to the sufficiency of the evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and

presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

**B. *Kidnapping for Robbery***

1. Statutory Elements

Aggravated kidnapping is kidnapping for the purpose of robbery or certain enumerated sex offenses. With respect to kidnapping for robbery, section 209, subdivision (b)(1), provides: "Any person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." Additionally, section 209, subdivision (b)(2), provides the statute "shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."

Kidnapping is defined in section 207, subdivision (a), as follows: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

2. Historical Development of the Law of Aggravated Kidnapping

Section 209, subdivision (b)(2), codified the analysis set forth in *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*). (*People v. Power* (2008) 159 Cal.App.4th 126, 138.)

6

In *Daniels*, the California Supreme Court found that the defendants' conduct of forcing three women to move about their rooms for distances of 5 or 6 feet, 18 feet, and 30 feet, respectively, while robbing and raping them did not amount to kidnapping. (*Daniels*, *supra*, at pp. 1126-1140.) The court reasoned the defendants' "primary intent" was to commit robberies and rapes, and briefly moving the victims from room to room was "solely to facilitate" these crimes rather than moving the victims "just for the sake of moving" them. (*Id.* at pp. 1130-1131.)

In making this distinction, the court expressed its concern that overzealous prosecutors could pursue aggravated kidnapping convictions, which then carried the death penalty, against defendants who had simply moved their victims incident to their target offense. (*Daniels*, *supra*, 71 Cal.2d at pp. 1130, 1135-1136, 1138.) Believing this was not the Legislature's intent, the court concluded that excluded from section 209's purview were not only "'standstill' robberies . . . but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself."[5] (*Id.* at p. 1139.)

Subsequent California Supreme Court jurisprudence has built upon the two-prong *Daniels* analysis. The court has held that under the first prong—whether the movement is merely incidental to the target offense—the trier of fact is to consider "the 'scope and nature' of the movement, which includes the actual distance a victim is moved." (*Vines*, *supra*, 51 Cal.4th at pp. 869, 870.) The court has made it clear, however, that "[t]here is . . . no minimum distance a defendant must move a victim to satisfy the first prong." (*Id.* at p. 871.)

---

[5]     Under *Daniels*, *supra*, 71 Cal.2d at page 1131, footnote 5, the movement had to substantially increase the risk of harm to the victim. In 1997, the Legislature amended section 209, subdivision (b)(2), to eliminate the requirement that the forced movement "'substantially' increase the risk of harm to the victim." (*People v. Vines* (2011) 51 Cal.4th 830, 869, fn. 20 (*Vines*).)

As for the meaning of "incidental," the Supreme Court has repeatedly rejected dictionary definitions of that word. (See *In re Earley* (1975) 14 Cal.3d 122, 130, fn. 11; *People v. Williams* (1970) 2 Cal.3d 894, 902.) Instead, the court has relied on *Daniels'* use of the word "incidental" as paired with "movement" in the first prong as meaning movement which is brief, and solely to facilitate the commission of the target crime. (See *Williams*, *supra*, at p. 902.) On the other hand, where the movement of the victim is "substantial," the court has held it is not incidental to the commission of the target crime, even if it occurred solely to facilitate that crime. (*Earley*, *supra*, at p. 130.)

Moving to the second prong, the Supreme Court has set forth a number of factors to be considered in determining whether the movement subjects the victim to an increased risk of harm above that inherent in the target offense. These factors include "the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes." (*People v. Rayford* (1994) 9 Cal.4th 1, 13-14, disapproved on another ground in *People v. Huynh* (2014) 227 Cal.App.4th 1210, 1215; see also *Vines*, *supra*, 51 Cal.4th at p. 871.)[6] The risk of increased harm to the victim includes psychological harm. (*People v. Nguyen* (2000) 22 Cal.4th 872, 886.)

3.   Relevant Application of the Two-Prong Test

In *People v. Dominguez* (2006) 39 Cal.4th 1141 (*Dominguez*), the California Supreme Court applied the two-prong analysis to movement of less than a significant distance. In *Dominquez*, the defendant forced a victim to move from a road, down an embankment, and partially into a walnut orchard, where he then raped and killed her. (*Id.* at pp. 1146, 1150-1151.) The site of the murder was approximately 25 feet away from the road and 10 to 12 feet below its surface. (*Id.* at pp. 1150-1151.) The Court of Appeal

---

[6]   The fact that these dangers do not in fact materialize does not mean that the risk of harm was not increased. (*People v. Rayford*, *supra*, 9 Cal.4th at pp. 13-14; see also *Vines*, *supra*, 51 Cal.4th at p. 871.)

had held that the relatively brief movement of the victim from the road to the bottom of the embankment was, as a matter of law, merely incidental to the commission of the rape and thus insufficient to support a conviction for aggravated kidnapping. (*Id.* at p. 1154.) The Supreme Court disagreed with its analysis.

In reversing the appellate court, the *Dominquez* court cautioned that application of the two-prong test is not "a simple verbal formulation that would apply to all cases," but "necessarily depend[s] on the particular facts and context of the case." (*Dominguez*, *supra*, 39 Cal.4th at pp. 1151, 1153.) The court emphasized the first prong involves considering not only "'the "scope and nature" of the movement,'" but also "'the context of the environment in which the movement occurred,'" which is "a multifaceted, qualitative evaluation rather than a simple quantitative assessment." (*Id.* at pp. 1151-1152, italics omitted.) The court made clear that measured distance is just one factor to be considered, and the extent to which it is relevant depends upon the nature of the crime and its environment. (*Id*. at p. 1152.) "In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient." (*Ibid.*) The court reiterated that the two prongs "'are not mutually exclusive, but interrelated.'" (*Ibid.*)

On the facts of the case before it, the *Dominguez* court noted that although the "distance [was] not great," the fact the victim was forced from a relatively open road to a secluded orchard where it was unlikely a passing motorist would see her substantially decreased the possibility of detection, escape or rescue. (*Dominguez*, *supra*, 39 Cal.4th at p. 1153.) The court concluded there was thus sufficient evidence the coerced movement of the victim was not merely incidental to the commission of the rape and substantially increased the risk of harm to the victim beyond that inherent in the target offense. (*Id.* at p. 1155.)

*Vines*, *supra*, 51 Cal.4th 830, the most recent California Supreme Court decision applying the two-prong analysis, is instructive as it involved movement of a victim entirely within the interior of a building during a robbery, as is the case here. In *Vines*, the defendant moved the manager and other employees of a McDonald's restaurant "from

9

the front of the store, down a hidden stairway, and into a locked freezer." (*Id*. at p. 871.) The court held the scope and nature of the movement in the restaurant could not be construed as merely incidental to the robbery under the circumstances. The movement subjected the victims to a substantially increased risk of harm beyond that inherent in a robbery because of the cold freezer temperature, the decreased likelihood of detection and the inherent danger involved in the victims' foreseeable attempts to escape. (*Id.* at p. 871.)

       4. Application to the Trial Evidence

Here, as framed by the parties, the issue is whether the coerced movement of the victims from one room to another inside a residence satisfies the asportation requirement of aggravated kidnapping. Heeding the directive of *Dominquez* that both *Daniels* factors must be considered together and are interrelated, and that "each case must be considered in the context of the totality of its circumstances" (*Dominquez*, *supra*, 39 Cal.4th at p. 1152), we find there was no substantial evidence to support the convictions for aggravated kidnapping.

We first consider the "'scope and nature'" of the movement, including the actual distance the victims were moved. (*Vines*, *supra*, 51 Cal.4th at p. 870.) The distance of the movement in this case was extremely slight, moving the victims approximately three feet from the living room to a bathroom, all within a 1,300 square foot residence. Unlike the movement from roadway to secluded orchard presented in *Dominquez*, the movement here did not essentially change the environment in which the victims were held while the robbery was taking place. (*Dominquez*, *supra*, 39 Cal.4th at p. 1153.) The movement was not "excessive and gratuitous" (see *People v. Leavel* (2012) 203 Cal.App.4th 823, 836[7]), but appeared to be undertaken to facilitate the robbery.[8] Guarding the two victims

---

[7]     In *People v. Leavel*, *supra*, 203 Cal.App.4th 823, in the course of a residential robbery, the defendant moved the victim from the kitchen to the bedroom (where he ordered her to smoke cigarettes with him), to the kitchen (where the victim gave him ham and a beer), and ordered her to go to the bathroom and flush the ham down the toilet. He

10

in the bathroom made easier the movement of the accomplice through the victims' home in search of the safe, and was "'natural'" to the offense. (*Daniels*, *supra*, 71 Cal.2d at p. 1130, italics omitted.) "It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved into and left in another room or place." (*Id*. at p. 1135, italics omitted, citing with approval *People v. Levy* (1965) 15 N.Y.2d 159, 164 [204 N.E.2d 842, 844]; see also *People v. Power*, *supra*, 159 Cal.App.4th at p. 138 [citing same language].)

Turning to the second prong of the analysis, we find the increased risk of harm to the victims to be slight. Tsan testified that he believed a person on the sidewalk could see through the front window into the living room, but would not be able to see into the bathroom. However, unlike *Vines*, this robbery did not take place in a commercial business where patrons might be expected, but in a residential area. The likelihood of detection from outdoors seems tenuous, especially as Tsan was face down on the living room floor before being moved to the bathroom, and Zhou was zip-tied and on the couch momentarily before being brought to the bathroom.[9]

Nor is there substantial evidence that being held in the bathroom decreased the ability to, or increased the risk involved in, escape. In addition to the hallway door, the bathroom had another door leading to a laundry room, which in turn had an exit to the

---

later forced the victim outside the house with him to retrieve clothing, and back into the living room to watch him dress. (*Id*. at p. 827.) The court concluded this was "not a case of brief or slight movement naturally occurring in a robbery," but was "excessive and gratuitous" and therefore not incidental. (*Id*. at p. 836.)

[8]     This case is also distinguishable from *People v. Corcoran* (2006) 143 Cal.App.4th 272, cited by the People, in which victims of an attempted robbery of a bingo hall were moved 10 feet from a public area to a small back office without windows. There, the movement occurred only after defendant aborted his robbery attempt, and thus did not facilitate the robbery. (*Id*. at pp. 279-280.) In the instant case, the robbery attempt was ongoing after the victims were moved.

[9]     Moreover, to the extent a passerby might possibly see the two victims in the living room through the front window, so might they see defendant and his accomplice as they roamed around the residence in search of the safe.

11

house. Unlike the freezer into which the victims were moved in *Vines*, there was no evidence that something inherent in the environment of the bathroom itself increased any physical or psychological risk to the victims. Here, considering the two factors together, we find the extremely slight distance of the movement, its insignificant effect on the environment in which the victims were held, and the minimal showing that the movement increased the risk to the victims beyond that inherent in the robbery, lead to a conclusion that the movement was incidental to the robbery, and cannot support a conviction for aggravated kidnapping.[10]

## DISPOSITION

The judgment as to counts 2 and 3 is reversed and the cause remanded for resentencing. The judgment of conviction as to the remaining counts is affirmed.

STROBEL, J.[*]

We concur:

PERLUSS, P. J.                    SEGAL, J.

---

[10]    Tristau also urges us not to exercise our authority under section 1260 to reduce the aggravated kidnapping conviction to the lesser included offense of simple kidnapping (§ 207). The People do not address this issue in their brief. Reduction to simple kidnapping would not be appropriate. "'When an "associated crime" *is* involved, there can be no violation of section 207 unless the asportation is more than incidental to the commission of that crime.'" (*People v. Martinez* (1999) 20 Cal.4th 225, 237, quoting *In re Earley*, *supra*, 14 Cal.3d at p. 129, fn. 9.)

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.