Filed 10/29/13  P. v. Vance CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054460 |
| v. | (Super.Ct.No. FSB1100293) |
| CALVIN RAY VANCE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Duke D. Rouse, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part with directions.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.    Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

## INTRODUCTION[1]

A jury convicted defendant Calvin Ray Vance of 13 offenses[2] arising from the gang-related robbery of about $169 from a Jack in the Box restaurant. The evidence at trial showed that defendant had also robbed a Burger King restaurant 10 days before. Codefendant Dewayne Maurice Riley was the gunman in the Jack in the Box robbery. Defendant was the gunman in the Burger King robbery.[3]

The court sentenced defendant to an aggregate prison term of 207 years 4 months, based on an indeterminate term of 190 years to life and a determinate term of 17 years 4 months.[4] Codefendant Riley was convicted of 12 offenses and sentenced to an aggregate

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] Counts 1 through 5, kidnapping for robbery, in violation of section 209, subdivision (b)(1); counts 6 through 10, robbery, in violation of section 211; count 11, evading a police officer, in violation of Vehicle Code section 2800.2, subdivision (a); count 13, felon in possession of a firearm, in violation of section 12021, subdivision (a)(1); and count 14, street terrorism in violation of section 186.22, subdivision (a). The information also alleged that a principal had used a firearm, in violation of 12022.53, subdivision (e) (counts 1 -10), and the offenses were committed for the benefit of a gang, in violation of 186.22, subdivision (b)(1) (counts 1-10, 11, 13). The information further alleged that defendant had sustained a prior strike conviction, a serious felony and four prison priors. After defendant waived his right to a jury trial, the court found the prior convictions true beyond a reasonable doubt.

[3] Defendant has a pending case involving the Burger King crimes. (*People v. Vance*, case No. FVI1100356.)

[4] The court's minute order is incorrect and should be corrected as discussed in our disposition.

prison term of 243 years (225 years to life plus 18 years).  Riley has filed a separate

appeal, case No. E056633.

On appeal defendant challenges the gang enhancements, the five convictions of

kidnapping for robbery, the conviction for possession of a firearm, the evidence of aiding

and abetting, the evidence that defendant drove the getaway car, and the admission of an

uncharged act.  Defendant also argues two kinds of sentencing error.  We reverse

defendant's conviction on count 1 for aggravated kidnapping and order the trial court to

impose the stayed sentence on count 6.  Otherwise, we reject defendant's contentions and

affirm the judgment.

## II

## STATEMENT OF FACTS

### A.  *The Jack in the Box Robbery*

About 9:00 p.m. on January 18, 2011, five employees were working at a Jack in

the Box restaurant located in Colton, California:  Javid Bholat, the manager; Monica

Ramirez, the cashier; Guadalupe Moreno and Carlos Melendez, both cooks; and Ariadne

Cedillo, the shift leader.

In addition to a kitchen area, the food restaurant has an interior manager's office,

five by 13 feet, with two safes.  The sink area is behind the office and the break room is

behind the sink area.  The sink area and the break room are at the back of the restaurant.

Bholat, Melendez and Cedillo were standing in the kitchen near the deep-fat fryer.

Near the back of the restaurant, Moreno was washing dishes at the sinks and Ramirez was

coming out of the break room.  A hooded, masked man—wearing gloves and carrying a

3

handgun—jumped over the front counter, demanded money, and herded all five employees into the manager's office in the center of the restaurant. All the employees were afraid and felt threatened.

Bholat, the manager, testified that the gunman singled him out and, pointing the gun, asked, "Where is the money?" Although there were two open cash registers at the counter and the drive-through window, Bholat told him there was cash in a safe in the office. At direction of the gunman, Bholat and the other employees went into the office.

After Bholat opened one safe and gave the robber the small amount of money ($17) inside, the robber demanded money from the other safe. Bholat explained that it was equipped with a 10-minute delay. When the robber objected to waiting, Bholat instructed Cedillo to get money from the cash register at the counter. Cedillo retrieved some cash and gave it to the robber who jumped the counter and ran out the north door of the restaurant.

While Bholat called 911, Cedillo watched the robber get in a black four-door vehicle positioned outside the north door. Defendant later identified the car as a Chevrolet Caprice, owned by defendant's mother. The vehicle drove onto Mt. Vernon, then turned onto Washington toward the 215 freeway.

*B. The High Speed Chase*

Two Colton Police Officers, Gary Gruenzner and Roberto Dimas, responded quickly in marked police vehicles at the restaurant. Some bystanders on the corner directed them to follow a black vehicle onto the 215 freeway. As Gruenzner approached the onramp, he observed a black vehicle rounding the onramp at a high rate of speed.

4

Dimas joined the chase.

The black vehicle continued on the freeway at speeds of 80-85 miles per hour. Gruenzner could see a driver and a passenger in the backseat. As more police vehicles joined the pursuit, they activated their overhead lights and sirens. The black vehicle accelerated to 105 miles per hour. The black vehicle veered across all lanes of travel and exited the freeway at Baseline and 13th. Dimas followed the vehicle as it sped through the intersection of 13th and H Streets, veered into a pole at the side of the road—spinning out of control and striking a truck—before stopping. After the collision, the truck driver saw a person he could not identify exit the black vehicle and take off running.

*C. Additional Prosecution Evidence*

When Dimas arrived at the scene, the black vehicle was stopped. Dimas watched a Black male who was Riley exit on the driver's side and start running. The front passenger door had been damaged and could only be opened by force. Dimas chased Riley and captured him in the backyard of a nearby house, where he was taken into custody after a brief struggle. The police found a black cotton glove near the scene. Riley had a wad of cash[5] in his pocket, corresponding to the money that Cedillo had given the masked robber. Riley wore a pair of Nike shoes, which matched the shoe print lifted from the dining room floor of the restaurant.

San Bernardino Police Officer Brian Harris helped search for suspects at the corner of G and Virginia Streets. A witness, who lived next to the church on that corner,

---

[5] Forty-four $1 dollar bills, nineteen $5 bills, and three $10 bills.

5

reported seeing a person jump a fence, remove clothing, and hide next to the church when a police helicopter flew over. Harris recovered the clothing, which was still warm, and found defendant hiding next to a hedge in the church courtyard. Defendant was sweating profusely, disheveled, and wearing a tank top.

The vehicle contained a hooded sweatshirt, various hats and gloves, and a loaded .38 special Rosse handgun, resembling the gun used in the robbery. The vehicle license plate number was 3SWZ263. In an earlier robbery of a Burger King restaurant in Hesperia, the reported license plate number of the getaway vehicle, 3SW7263, was one symbol different—a "7" instead of a "Z."

*D. The Burger King Robbery*

In the Burger King robbery, around 8:00 p.m. on January 8, 2011, defendant came into the restaurant, where he was greeted by an employee, Nikki Olson, and proceeded to use the restroom. After defendant left the restaurant, he returned wearing a bandanna over his face. He confronted the employees with a gun, demanding money from the safe. Although his face was partially covered, Olson recognized defendant because he wore the same clothing and had two tears tattooed below the corner of his left eye. Another employee, Patricia Dozier, recorded the license plate number. The handgun used in the Jack in the Box robbery resembled the gun defendant used in the Burger King robbery.

*E. Gang Evidence*

A gang expert, San Bernardino Police Officer Raymond Bonshire, testified that defendant and Riley are both active members of the Projects criminal street gang. During booking for the charged robberies, both admitted being members of the gang. Both are

6

named in a gang injunction issued against the Projects gang. When served with the injunction in 2005, both defendant and Riley admitted being gang members. Defendant was again served with the injunction in jail in 2007 and admitted being a gang member. Defendant's gang moniker is Tiny Pride. Riley and defendant both had multiple gang tattoos, indicating long-time gang membership. The gang territory is west of the 215 freeway in San Bernardino.

Bonshire described the history and culture of the Projects gang, its name, color, and symbols. He explained how gang admission works and the gang's activities. He estimated the Projects's membership was about 100. The primary activities of the Projects street gang are narcotics sales, firearm possession, burglaries, robberies, and shootings, including murders. Gang members commit crimes together. Committing a robbery elevates a gang member's status in several ways: it is "putting in work . . . for the gang"; it demonstrates active membership and "good standing"; it provides money to buy clothing and other status symbols and recruit new members; and it provides money to finance the gang's other activities.

Bonshire described three predicate offenses: a 2009 grand theft committed by gang member, Tommy Walker; two 2009 armed robberies with a gang enhancement committed by gang member, Cedric Timmons; and two 2008 robberies committed by gang member, Broderick Moore.

Based on hypothetical questions, Bonshire opined that the Jack in the Box crimes and flight were committed by gang members working together and would enhance their status and reputations by demonstrating their willingness to commit crimes with other

7

gang members, their disregard of the law, and their willingness to do anything for the gang. Choosing to commit the crimes outside the gang's territory facilitates commission of the crimes because it occurs away from the local police department familiar with the gang, its members, and the gang injunction. Bonshire said that the crimes would be discussed within the gang community and the community in general, thereby enhancing the gang's reputation and the fear and intimidation experienced by potential crime victims and witnesses. He also testified that gang members typically order victims to move around during robberies in order to intimidate them

*F. Defense Evidence*

Heather McBride testified that she was working at a Burger King with Nikki Olson when a man came in the restaurant. She saw the same man about 15 minutes later when he robbed the employees at gunpoint while wearing a bandanna. In a police photo lineup, she identified someone other than defendant. However, during cross-examination, McBride identified defendant as the Burger King robber and she said she was unsure of her identification at the time of the photo lineup. She also testified that defendant carried a silver revolver that was similar in color to the revolver used in the Jack in the Box crimes.

III

GANG ENHANCEMENTS

Defendant challenges the sufficiency of the evidence to support the jury's true findings on the criminal street gang enhancements. He contends there was inadequate support for the gang expert's opinion that the Projects gang was a criminal street gang

8

based on its primary activities and that the crimes in this case were gang-related. We apply a deferential standard of review and do not reweigh the evidence or reevaluate a witness's credibility. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

Section 186.22 imposes enhanced penalties for gang-related felonies. (§ 186.22, subd. (b).) Section 186, subdivision (b), does not punish mere gang membership; rather the penalties apply only where the evidence shows a defendant's felonious criminal conduct has been committed "'for the benefit of, at the direction of, or in association with' a group that meets the specific statutory conditions of a 'criminal street gang,' . . . [and] with the 'specific intent to promote, further, or assist in any criminal conduct by gang members.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 623-624.) A "criminal street gang" is defined as any ongoing association of three or more persons, sharing a common name or common identifying sign or symbol; one of the group's primary activities must be the commission of one of the specified predicate offenses; and one of the group's members must engage in or have engaged in a pattern of criminal gang activity. (*People v. Loeun* (1997) 17 Cal.4th 1, 8; § 186.22, subd. (f).) To satisfy the primary-activities requirement, the commission of enumerated crimes must be the group's "chief" or "principal" occupation. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)

Reliable expert testimony may establish the elements of a gang allegation. (*People v. Gardeley, supra,* 14 Cal.4th at p. 618; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1226.) Where the expert's testimony establishes no more than the occasional commission of an enumerated crime, the expert's opinion does not constitute substantial

9

evidence in support of an enhancement requiring an indeterminate life term.  (*People v. Perez* (2004) 118 Cal.App.4th 151, 160.)  Defendant asserts the gang expert did not testify based on specific and reliable facts that the Projects gang consistently and repeatedly committed one or more of the offenses enumerated in section 186.22.  Instead, Bonshire offered a "laundry list of crimes" and could not state specifically how many robberies and drug crimes had been committed by the gang in the previous two years.

We disagree with defendant's characterization of Bonshire's testimony as referring only to occasional crimes.  Instead, as described above, Bonshire, who had an extensive background of gang contacts and training, testified about the primary criminal activities of the Projects gang and described multiple predicate offenses for robberies and grand theft in 2008 and 2009.  Defendant, an admitted gang member, had also robbed the Burger King only 10 days before the Jack in the Box robbery.  Bonshire's expert opinion was not speculative or conclusory but was based on years of experience and investigations and specific crimes committed in 2008, 2009, and 2011.  The quality of the evidence was significantly different and stronger than the evidence in *Perez*, relied upon by defendant.  Here substantial evidence supported the jury's finding of the primary activities element.

Additionally, the evidence showed defendant's crimes were gang-related in that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang.  (*People v. Martinez* (2004) 116 Cal.App.4th 753, 762; *People v. Albillar, supra,* 51 Cal.4th at p. 60.)  In *Albillar, supra,* three gang members raped a female acquaintance.  Because the victim was aware of the gang status of her assailants,

and based "on the way in which the gang members worked cooperatively to accomplish the rapes, the brutality and viciousness of the crimes, and the enhancement to the reputations for violence and viciousness of the gang and the participating gang members" the gang expert offered his opinion that the charged crimes would have been committed for the benefit of and in association with a criminal street gang. (*Abillar,* at pp. 53-54, 63.) In holding that this opinion provided sufficient evidence to support the gang enhancement, the California Supreme court found that the "record supported a finding that defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses against [the victim]." (*Id*. at p. 60.) In other words, "[t]hey relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police." (*Id.* at p. 62.)

Defendant attempts to distinguish *Albillar* because the Jack in the Box was located outside the Projects gang's territory and the employees were not aware of the gang or did not know that Riley was a Projects gang member. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 227.) The employees also did not know that defendant, another Projects gang member, was waiting in the car outside. Thus, no evidence was presented that "defendants relied on their common gang membership and the apparatus of the gang in committing" the charged offenses. (*People v. Albillar*, *supra*, 51 Cal.4th at p. 60.) Under these circumstances, defendant asserts the record does not support that "that defendants came together as *gang members* to [rob the victims] and, thus, that they committed these crimes in association with [or for the benefit of] the gang." (*Id.* at p. 62;

11

*People v. Ramon* (2009) 175 Cal.App.4th 843, 851.)

Again, we disagree with defendant's characterization of the record. Here, as in *Albillar*, the record shows that defendant and Riley cooperated as gang members to commit the subject crimes and to achieve a common benefit for the gang. Even if defendant and Riley acted outside the gang's territory and the employees did not know they were gang members at the time of the robbery, the gang's reputation could be enhanced by subsequently publicizing their exploits to the community at large. Accordingly, sufficient evidence supported the gang enhancement. (*People v. Albillar, supra,* 51 Cal.4th at pp. 62-63.)

IV

AGGRAVATED KIDNAPPING

Defendant challenges the sufficiency of evidence on all five of his convictions for aggravated kidnapping for robbery. (§ 209, subd. (b)(1).) Under section 209, aggravated kidnapping, requires "movement of the victim . . . beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2); *In re Earley* (1975) 14 Cal.3d 122, 128.) Defendant contends the movement of all five employees was insufficient evidence of asportation because it was "merely incidental" to accomplishing the robbery and did not increase the risk of harm to them. As discussed below, we conclude that the conviction on count 1 for aggravated kidnapping of Bholat, the manager, should be reversed but the remaining convictions are affirmed.

The California Supreme Court reviewed this issue comprehensively in *People v.*

12

*Vines* (2011) 51 Cal.4th 830, 869-871, in which defendant moved the employees between 80 and 200 feet and locked them downstairs in a walk-in freezer to accomplish a robbery. *Vines*, at page 869, applied a deferential standard of review. The *Vines* court commented that the two elements of incidental movement and increased risk of harm "are not mutually exclusive but are interrelated." (*Id.* at p. 870, citing *People v. Rayford* (1994) 9 Cal.4th 1, 12.) With regard to the first prong, the jury considers the scope and nature of the movement—including the actual distance a victim is moved—but there is no minimum distance. (*Vines,* at p. 870.) The second prong involves consideration of factors such as the decreased likelihood of detection, the danger inherent in the victims' foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (*Ibid.*) Although these principles seem fairly straightforward, California courts have applied them differently depending on the factual circumstances.

Some California cases have found the brief movement of robbery victims within a business establishment or residence insufficient to constitute aggravated kidnapping: "[I]ncidental movements are brief and insubstantial, and frequently consist of movement around the premises where the incident began." (*People v. Diaz* (2000) 78 Cal.App.4th 243, 247; *People v. Williams* (1970) 2 Cal.3d 894 [service station attendant locked inside station bathroom and then moved around premises]; *People v. Mutch* (1971) 4 Cal.3d 389, 397-399 [movement of victims 30 to 40 feet through different rooms inside a business]; *People v. Morrison* (1971) 4 Cal.3d 442, 443 [movement of victim up and down stairs and into rooms of private residence]; *People v. Smith* (1971) 4 Cal.3d 426, 427 [movement of hotel clerk from office to second floor room of hotel]; *People v. John*

13

(1983) 149 Cal.App.3d 798, 804, [movement of victim through different buildings in residence]; *People v. Hoard* (2002) [Fourth Dist., Div. Two] 103 Cal.App.4th 599, 607 [movement of two victims to the back office of a jewelry store]; *People v. Washington* (2005) 127 Cal.App.4th 290, 295-296 [a bank officer and teller moved into a bank vault].)

On the other hand, in cases that are factually similar, courts have concluded that brief movement was not incidental to robbery and increased the risk of harm to the victims. (*People v. James* (2007) 148 Cal.App.4th 446, 457, [coerced movement of one person when the intended target of the robbery was another person]; *People v. Corcoran* (2006) 143 Cal.App.4th 272, 279 [movement of victims about 10 feet from outside a bingo hall to a windowless back office].)

In *Vines*, as in this case, the forcible movement of the victims was also limited to movement inside the premises when a masked, armed robber herded a McDonald's restaurant manager and other employees into the manager's office where a safe was located. In *Vines*, however, the defendant also directed the victims from the front of the store, down a hidden stairway, and into a locked freezer. The scope and nature of this movement was not "merely incidental" to the commission of the robbery. Additionally, the victims suffered an increased risk of harm because of "the low temperature in the freezer, the decreased likelihood of detection, and the danger inherent in the victims' foreseeable attempts to escape such an environment." (*People v. Vines, supra,* 51 Cal.4th at p. 871.) On this record, the Supreme Court concluded sufficient evidence of asportation supported defendant's convictions for aggravated kidnapping.

14

It is difficult to extract a rule from these cases which seem to reach opposing conclusions. Nevertheless, a significant factor in all the cases is whether the movement—whatever the distance—was necessary to obtain control of the property and facilitate the robbery.

In *People v. Hoard, supra,* 103 Cal.App.4th at pages 601-602, 607, the defendant entered a jewelry store and moved two female employees 50 feet at gunpoint to the back office, where he bound them with duct tape. After confining them to the back room, he robbed the store. In reversing the convictions for aggravated kidnapping, this court noted that "[c]onfining the women in the back office gave defendant free access to the jewelry and allowed him to conceal the robbery from entering customers who might have thwarted him." (*Id.* at p. 607.) Accordingly, "[d]efendant's movement of the two women served only to facilitate the crime with no other apparent purpose." (*Ibid.*) The asportation of the victims was "merely incidental" to the robbery and did not increase the risk of harm.

In *People v. Washington, supra,* 127 Cal.App.4th at pages 295-296, two defendants robbed a bank. While armed with a gun, one defendant jumped over the front counter and directed two tellers to empty the cash drawers. The second defendant, also armed, entered the bank manager's office and demanded money. The manager asked a teller to assist her in the vault. The manager and teller moved 14 or 15 feet into the vault. In holding that the movement of both victims was incidental to the robbery and did not increase the risk of harm, the court observed "robbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the

15

business that are held on the business premises." (*Id.* at p. 300.) Crossing thresholds within the business to obtain property cannot elevate robbery to aggravated kidnapping. (*Ibid.*) Given that the primary object of a robbery is to obtain money, the movement of employees to that area to facilitate that crime must be deemed incidental. (*Id*. at p. 303.)

*Corcoran* recognized some distinctions in its discussion of *Hoard* and *Washington.* In *Washington,* "movement was necessary to obtain the money and complete the robbery[. I]n the present case the victims were not taken to the location of the money the robbers sought to obtain. In *Washington,* 'there was no excess or gratuitous movement of the victims over and above that necessary to obtain the money in the vault.' (*Washington, supra*, 127 Cal.App.4th at p. 299.) In the instant case, the movement of the victims had nothing to do with facilitating taking cash from the bingo hall; defendant and his accomplice had aborted that aim, and their seclusion of the victims in the back office under threat of death was clearly 'excess and gratuitous.'" (*People v. Corcoran, supra,* 143 Cal.App.4th at pp. 279-280.) Similarly, when compared with *Hoard,* "the movement of the victims did not serve to facilitate the forcible attempted taking of money from the bingo hall. Rather, it served other purposes squarely recognized by the Supreme Court . . . as supporting a finding of a substantial increase in danger: removing the victims from public view, decreasing the odds that the attempted robbery of cash from the bingo hall would be detected, increasing the risk of harm should any victim attempt to flee, and facilitating the robbers' escape. Indeed, there was no purpose for moving the victims to the back office except to facilitate these aims. In context, this movement was not merely brief and trivial; to the contrary, it substantially

16

increased the risk of harm beyond that inherent in the crime of attempted robbery." (*Corcoran,* at p. 280.)

In this case, a masked, armed robber, later identified as codefendant Riley, burst into the Jack in the Box, making demands for money. Bholat, the manager, told Riley the money was in the safe and Riley demanded Bholat open the safe. At the same time, the robber directed the other four employees to go into the manager's office while Bholat opened the safe. Because there was very little money in the safe, Bholat—not Riley— instructed Cedillo to get money from the cash register at the counter. The evidence shows that Riley told Bholat to retrieve money from the safe in the office to facilitate the robbery, making the movement of Bholat incidental to the robbery of the safe.

Based on *Vines, Corcoran, Hoard,* and *Washington,* we conclude the brief movement of Bholat to the office where the safe was located was incidental to the robbery. As conceded by the People, there was no way to accomplish the robbery from the safe except for Bholat to go into the office. Furthermore, although there was also money in the cash register, when Cedillo went to the cash register, she was instructed to do so by Bholat, not the robber. However, the movement of the four employees, other than Bholat, into the office, was not done to facilitate the robbery. Placing them in the enclosed space of the manager's office, out of public view, and threatened with a gun certainly caused them to suffer the threat of increased risk of harm. Accordingly, viewing the evidence in the light most favorable to the People (*People v. James, supra,* 148 Cal.App.4th at p. 453), the record was insufficient as a matter of law to support the

17

verdict as to count 1 (Bholat) but substantial evidence supported the kidnapping convictions as to counts 2 through 5.

V

FELON IN POSSESSION OF A FIREARM

Section 12021 punishes any person convicted of a felony who thereafter possesses a firearm. (§ 12021, subd. (a)(1).) "The elements of the offense proscribed by section 12021 [include] conviction of a felony and ownership, possession, custody or control of a firearm." (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 922.) The prosecution can prove a felony conviction in open court or defendant can agree to stipulate to the conviction. (*People v. Sapp* (2003) 31 Cal.4th 240, 261; *People v. Valentine* (1986) 42 Cal.3d 170, 173.) Defendant agreed to admit that, for the purpose of count 13, he did have a prior felony, and the only issue for the jury was whether he possessed a firearm in conjunction with Riley. The jury was not informed of defendant's admission of his felony conviction.

According to the evidence, Riley was the gunman in the robbery. Defendant was apprehended in a nearby churchyard after the getaway car's collision. Defendant contends that, because defendant's admission that he was an ex-felon was never actually presented to the jury, the evidence was insufficient to sustain a finding that defendant had previously been convicted of a felony. Defendant also disputes there was sufficient evidence to support defendant's conviction for constructive possession of a firearm. (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1413-1419.)

On the first point, we agree with the People that, because the prosecution did not have to prove that defendant was an ex-felon, it was not essential to tell the jury about

18

defendant's admission that he was an ex-felon. In fact, the jury was instructed, based on CALCRIM No. 2510, that the prosecution only had to prove that defendant knowingly possessed a weapon.

We also conclude there was sufficient evidence of constructive possession. Constructive possession may be shown when a defendant is an occupant of a vehicle in which a gun is located. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410-411; *People v. Nieto* (1966) 247 Cal.App.2d 364, 366-368.) Defendant was driving the getaway car for the robbery and the gun was found on the driver's floorboard. Defendant had used a similar gun in the Burger King robbery 10 days earlier. Ample evidence of possession supported defendant's conviction as a felon in possession of a firearm.

VI

AIDING AND ABETTING AND EVADING POLICE

The prosecution alleged defendant was guilty of robbery as an aider and abettor, and that he was further liable for the kidnapping for robbery offenses under the natural and probable consequences doctrine. Defendant contends there is insufficient evidence he aided and abetted the Jack in the Box robbery and kidnappings by waiting outside and driving the getaway car owned by his mother. Defendant argues the record disclosed only that Riley entered the restaurant alone and robbed the employees before fleeing in defendant's mother's car. Defendant also challenges his conviction for evading a police officer while driving.

A defendant who assists another to commit a crime is guilty as an aider and abettor. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *People v. Beeman* (1984) 35

19

Cal.3d 547, 561; *People v. Miranda, supra,* 192 Cal.App.4th at p. 407.) A defendant may also be guilty as an accomplice for any other crime that is the "natural and probable consequence" of the target crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 261.) Under an aiding and abetting theory of liability, the prosecution must prove that the defendant "acted with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, encouraging, or facilitating commission of the target offense." (*In re Meagan R.* (1996) 42 Cal.App.4th 17, 22.) Although "mere presence" at the scene is not sufficient to show aiding and abetting, it may be a relevant circumstance as well as companionship and conduct before and after the offense. (*People v. Miranda, supra,* 192 Cal.App.4th at p. 407.)

Under the deferential standard of review, a reviewing court presumes the facts support the judgment even if circumstances might reasonably be reconciled with a contrary finding. We do not reevaluate the evidence or the credibility of witnesses. (*People v. Albillar, supra,* 51 Cal.4th at p. 60.)

In this case, defendant and Riley were fellow gang members. Defendant admitted the getaway car was registered to his mother but he was the owner and sole driver. After the robbery, Cedillo watched Riley leave the restaurant and enter defendant's car that pulled away immediately, heading for the freeway. The officers followed the car until it crashed into a truck. After Riley was spotted leaving the vehicle, officer Dimas apprehended him. A witness saw defendant take refuge in a churchyard while removing his clothing and hiding from the police helicopter. An officer found the discarded

20

clothing and apprehended defendant. The handgun found in the car and the vehicle license plate connected defendant with the earlier Burger King robbery.

Taken as a whole, the evidence supported a finding that defendant waited in the car while Riley committed the crimes in the Jack in the Box and then led the police in a high speed pursuit until he crashed. (Veh. Code, § 2800.2; *People v. Acevedo* (2003) 105 Cal.App.4th 195, 198.) Substantial circumstantial evidence demonstrated defendant acted as an aider and abettor of robbery and aggravated kidnapping and committed the offense of evading a police officer.

VII

EVIDENCE OF OTHER CRIMES

Defendant also challenges the trial court's admission of evidence about the Burger King crimes 10 days before the charged crimes. The trial court ruled the evidence was admissible to show intent, knowledge, motive, or identity. (Evid. Code, §§ 352, 1101, subd. (b); CALCRIM No. 375.) It further held that any prejudice did not substantially outweigh the probative value. This court reviews a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Gray* (2005) 37 Cal.4th 168, 202; *People v. Cole* (2004) 33 Cal.4th 1158, 1198.)

Generally, the admission of prior-crimes evidence depends on the degree of similarity between the crimes. Proving intent requires the least degree of similarity. Proving a common plan or scheme requires a greater degree of similarity. Evidence may

21

be excluded if it is more prejudicial than probative. (*People v. Kelly* (2007) 42 Cal.4th 763, 783-784.)

Here the evidence showed considerable similarity between the Jack in the Box and Burger King crimes. The incidents occurred only 10 days apart. The crimes occurred in the evening at fast food restaurants located close to the freeway. The same car and a similar gun were used. In both cases, the gunman covered his face and ordered the manager to open the safe. Defendant apparently played the same role in the Burger King crimes as Riley did in the Jack in the Box crimes. The evidence in the two cases signified a plan not "a series of spontaneous events." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) The Burger King crimes were not more inflammatory than the charged offenses. (*Id.* at 405.) For these reasons, we find no abuse of discretion in the trial court's ruling.

VIII

SECTION 654

Section 654 prohibits multiple punishment for a single act or indivisible course of conduct. (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) If all the criminal acts were incident to one objective, then punishment may be imposed only as to one of the offenses committed. (*People v. Beamon* (1973) 8 Cal.3d 625, 636-639; *People v. Harrison* (1989) 48 Cal.3d 321, 335.)

In the present case, defendant aided and abetted the crimes in the Jack in the Box by acting as a getaway driver. In a separate crime he evaded police, endangering them, the community at large, and the truck driver with whom he eventually collided. Thus,

22

defendant engaged in a course of conduct with various consequences to multiple victims. Under these circumstances, section 654 did not apply. (*People v. Oates* (2004) 32 Cal.4th 1048, 1062; *People v. King* (1993) 5 Cal.4th 59, 78.)

IX

THE PRIOR STRIKE CONVICTION

Defendant contends the trial court erred by not dismissing his prior strike conviction committed in 2001. (*People v. McGlothin* (1998) 67 Cal.App.4th 468, 474.) A trial court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 374, 377; *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 978.)

In *People v. Williams* (1998) 17 Cal.4th 148, 161, the California Supreme Court emphasized that "whether to strike or vacate a prior serious and/or violent felony conviction . . . the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Id.* at p. 161.) A defendant may deserve a lesser punishment. (*People v. Bishop* (1997) 56 Cal.App.4th 1245, 1250.)

Defendant contends the trial court did not consider the remoteness of the prior strike or the fact that defendant faced a lengthy term of imprisonment even absent a second strike sentence. (*People v. Garcia* (1999) 20 Cal.4th 490, 500.) Considering all

23

the relevant factors, defendant claims he should have been treated as though he fell outside of the Three Strikes scheme.

Defendant's argument fails because the record demonstrates he is a "career criminal" for whom the Three Strikes law was designed. (*People v. Stone* (1999) 75 Cal.App.4th 707, 717.) Defendant's 20-year criminal history began in 1991 when he was 10 years old and committed a burglary. When he was 12 years old in 1993 he was charged with assault with a deadly weapon and other offenses. His criminal career continued throughout his adolescence with charges filed in 1994, 1995, 1996, and 1999. After he turned 18, he was charged with at least eight more offenses in 2001, 2002, 2003, 2004, and 2007, including four felony convictions—one of which was a serious felony and strike (§ 246 [shooting at an inhabited building]—and which resulted in prison commitment. He had little success with probation or parole (five revocations). Defendant is still facing trial for the 2011 Burger King crimes. Defendant is also a loyal gang member.

Although defendant's 2001 prior strike conviction was 10 years before the present offenses in 2011, defendant has led a life of crime for 20 years. Nothing in the record supports a finding the trial court abused its discretion in not dismissing his prior strike conviction. (*People v. Williams, supra,* 17 Cal.4th at p. 163; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.)

X

DISPOSITION

We affirm the judgment except as follows.

24

We reverse count 1 for aggravated kidnapping and order the trial court to impose the stayed sentence on count 6.

We also order the trial court to correct the minute order and abstract of judgment. Specifically, pursuant to the gang allegation and the prior strike, the court imposed consecutive indeterminate terms of 38 years to life each on counts 2 through 5, based on 30 years to life plus five years imprisonment for the serious felony and three one-year terms for the prison priors. As to the determinate term, the court imposed: six years on count 11, plus four years pursuant to the gang allegation; one year four months on count 13, plus one year for the gang allegation, and five years for the serious felony. The sentences on counts 7-10, 14, and the gun allegation were stayed. The corrected abstract of judgment should be forwarded to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

RICHLI
J.