[Crim. No. 23420. First Dist., Div. Four. Dec. 13, 1983]

THE PEOPLE, Plaintiff and Respondent, v.
FREDDIE JOHN, Defendant and Appellant.

[black redaction block]

## COUNSEL

John K. Van de Kamp, Attorney General, Ronald E. Niver and Ann Jensen, Deputy Attorneys General for Plaintiff and Respondent.

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Joel Kirshenbaum, Deputy State Public Defender for Defendant and Appellant.

## OPINION

BALLACHEY, J.*—Freddie John appeals from his convictions by a jury of robbery (Pen. Code, § 211),[1] second degree burglary (§ 459), and kidnaping for purposes of robbery (§ 209, subd. (b)). The jury also found that a principal in the offense, Peter Garcia, a/k/a Peter Chavez, was personally armed with a firearm in the commission of the offenses within the meaning of section 12022, subdivision (a). On September 15, 1981, appellant was sentenced to state prison for life with the possibility of parole for the kidnaping for the purpose of robbery. He was sentenced to a concurrent upper term of five years for the robbery plus a one-year enhancement for the arming allegation. The burglary count was ordered "merge[d] into the sentence which is imposed" on the robbery count. Appellant was given the appropriate credits.

On May 21, 1981, the victim, Sean Clyne, lived in a pool house situated amidst a cluster of buildings on an eight-acre plot owned by his parents. Clyne was 24 years old. Other buildings in the cluster were the "main house" where his parents lived and some rental units. All of these buildings shared the same address. Although Sean lived in the "separate," "detached" pool house, he appears to have been allowed to enter the "main house" at any time and could utilize any of its facilities. The buildings were spread over different levels and were connected by a system of driveways,

*Assigned by the Chairperson of the Judicial Council.
[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

stairs and open air causeways. Clyne appears to have been left in charge of the entire Clyne family premises during the course of the events described here.

At 11 a.m. on May 21, 1981, Clyne encountered Peter Chavez, a/k/a Peter Garcia, on one of these driveways. Chavez stated that he was having car trouble; Clyne offered him the use of a phone. The two walked to the pool house and Chavez used the phone. Eventually, Clyne "heard a click" and Chavez stated, "Be cool, man, this is a robbery" or "[t]his is a robbery." Clyne turned to face Chavez and saw that Chavez had pointed a handgun at him. Chavez stood about five feet away from him. Chavez told Clyne "to keep my hands above my head, don't look at him or face away from him and then he wanted to know basic comings and goings of people on the property." After giving the requested information, Clyne described his subsequent contact with Chavez as follows: "We walked out of the pool house with me ahead, up the stairs . . . along the driveway and we started to go up the upper driveway. [¶] At about halfway up the upper driveway, we stopped and he had me wait at a point somewhere along here where he could see me while he was up here on the road. . . . [¶] I thought for a moment there I could have gotten away at this point when I was along this retaining wall and he was up here, because he wasn't looking at me all the time. He had the gun pointed at me but his attention was drawn to the—his partner that he was calling to. . . . [¶] From there he went further up the hill to about this point where the driveway meets the road . . . and that's about the point where he stopped. [¶] At that location he was signalling to someone up the road . . . [w]ith his hand or whistling. . . . [¶] Well, once his attention was back on me, when we start[ed] going back down the hill, we—he and I marched into the pool house again. . . . [¶] Back down the driveway and down the stairs and down these stairs back into the pool house."

Clyne estimated that they traversed 150 yards. It is unclear from the record whether such figure refers to the one-way or round-trip distance between the driveway and the pool house.

Chavez asked Clyne some additional questions and eventually Clyne heard another person enter the room. That person was identified by other witnesses as appellant.[2]

---

[2]These witnesses are: Sean's mother, Regina Clyne, who found appellant in her house when she returned from shopping and playing tennis; Virginia Gilmore, a neighbor, who observed appellant on her property at about 1:00 p.m.; Amador Delgado, who encountered appellant while he was working in the area; and the two deputy sheriffs who arrested appellant because he matched the description of the suspect they were "looking for relative to the incident at the [Clyne property]" and looked as if he had been fleeing through the types of shrubs and weeds found near the Clyne property.

Chavez "gave [appellant] an order, command, whatever, to tie . . . up" Clyne. Appellant tied Clyne's hands behind his back. Clyne was also blindfolded. Chavez tried to "calm . . . down" Clyne by reassuring him that "all they wanted was money and jewelry." Clyne asked Chavez not to steal his gold watch which he had placed either on the table or on a small cabinet near a window in plain view. Clyne later found the watch missing.

After about a minute the blindfold was removed and Clyne was taken from the pool house through the "open air causeway" and through two sets of sliding doors into the "master bedroom" of the main house. As they approached the sliding glass doors, Clyne could see from the reflection that two persons were behind him. He estimated the distance traveled as 210 to 230 feet, plus two sets of stairs of 10 steps each.

The State Public Defender has calculated that Clyne was moved a total distance of 465 feet; a distance ". . . at least for sports aficionados . . . [which] approximates the distance from the center field wall to the backstop behind home plate on a typical major league baseball field."

Clyne testified that once inside the master bedroom, "I was blindfolded and my feet were tied together. I was told to lie still on the couch, at which point I could hear them rifling through drawers. . . . It was obviously two people . . . ." Clyne then heard his mother's car arrive. The room became quiet and Clyne managed to get the blindfold off, hobble to the phone and call the sheriff's department with his tongue.

Clyne also testified that Chavez, who was not in court, "did 'almost all' of the talking, and that there was" no "force or weapon shown" before he "got to the pool house" with Chavez.

The sheriff found Clyne's gold watch in appellant's pocket. A neighbor of the Clynes who had observed appellant on her property discovered a distinctive box in the area where she had first seen him. The box was identified as belonging to Sean Clyne's father. It had contained a silver dollar and was given to him by General Electric Company. It had been kept in Mr. Clyne's desk in the main house but was missing after the incident on May 21. Other items missing from the main house were a gold necklace, a pair of gold earrings, two rings, and a gold bracelet. Neither the coin nor the other items were found on appellant.

An AMC Hornet was found parked at the Clyne property. It did not belong to anyone known by the Clynes. Keys found in appellant's pocket fit both the passenger door and ignition.[3]

---

[3]The entire crime scene, including the car and plastic coin box, were processed by lab technicians and appellant's fingerprints and bootprints were not found.

Appellant did not testify. Courtland Blooze, an automobile mechanic and teacher, was the only witness for the defense. He also qualified as an expert witness regarding AMC cars. He testified that appellant was a student in his class and was training to be an auto mechanic. Blooze also testified that appellant had "occasion to use keys to other people's cars" and in the past he had retained keys to automobiles after working on them." Blooze further testified that in his opinion 40 percent of all AMC keys would operate a 1974 Hornet.

## A. The Kidnaping Conviction

The parties agree that CALJIC No. 9.23, which was given at the trial in this case, accurately states the elements which must be proved in order to establish a violation of section 209. The instruction reads: "[1. That a person was moved by the use of physical force,] [¶] [1. That a person unlawfully was compelled to move because of the reasonable apprehension of harm,] [¶] 2. That the movement of such person was caused with the specific intent to rob him and that the person causing such movement had such specific intent to rob when the movement commenced, [¶] 3. That the movement of such person was against his will and without his consent, [¶] 4. That the movement of such person was for a substantial distance, that is, a distance more than slight or trivial, [¶] 5. That such movement substantially increased the risk of significant physical injuries to such person over and above those to which such person normally would have been exposed in the commission of the crime of robbery itself."

The instruction is derived from *In re Earley* (1975) 14 Cal.3d 122 [120 Cal.Rptr. 881, 534 P.2d 721], and *People v. Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den. 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118], disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, footnote 12 [160 Cal.Rptr. 84, 603 P.2d 1]. These rules are derived from the landmark case of *People v. Daniels* (1969) 71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], wherein the Supreme Court held ". . . that the intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach not only 'standstill' robberies [citation] but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." "Indeed, when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence, as here, or a place of business or other enclosure—his conduct generally will not be deemed to constitute the offense proscribed by section 209. Movement across a room or from one room to another, in short, cannot

reasonably be found to be asportation 'into another part of the same county.'" (71 Cal.2d at p. 1140.)

The clear import of *Daniels* is that there must be both asportation not merely incidental to the associated robbery, *and* a substantial increase in the risk of harm over and above that necessarily present in the robbery itself. (*In re Earley, supra*, 14 Cal.3d at p. 129.)

Following *Daniels* the Supreme Court found the evidence insufficient to support a violation of section 209 in several cases where the facts are quite similar to those in this case.

Thus in *People* v. *Smith* (1971) 4 Cal.3d 426, 427 [93 Cal.Rptr. 743, 482 P.2d 655], the court held: "In the course of robbing a hotel, Smith and his companions caused the night clerk to move about the office and up to a second-floor room, and a bellboy to move across that room. These movements were merely incidental to the robberies and did not substantially increase the risk of harm beyond that inherent in the robberies themselves. (*People* v. *Daniels, supra*, 71 Cal.2d at p. 1139.)"

Likewise *People* v. *Morrison* (1971) 4 Cal.3d 442, 443 [93 Cal.Rptr. 743, 482 P.2d 655]: "In the course of robbing one person in the confines of a private residence, Morrison caused her to move up and down the stairs and into various rooms. These movements were merely incidental to the robbery and did not substantially increase the risk of harm beyond that inherent in the robbery itself. [Citation.]"

Finally, in *In re Crumpton* (1973) 9 Cal.3d 463, 466 [106 Cal.Rptr. 770, 507 P.2d 74]: "Particularly relevant here is *People* v. *Williams* (1970) 2 Cal.3d 894 [88 Cal.Rptr. 208, 471 P.2d 1008], in which we held a service station, including the adjacent outdoor areas, to be analogous to a place of business or enclosure within our meaning in *Daniels*. In *Williams* the victims were forced to move to several different sites on the service station grounds. If such conduct was insufficient to activate section 209, the movement in the present case is also inadequate for that purpose."

■ We conclude that the movement in the present case is well within the *Daniels* rule because Clyne was never forced to move outside of the interconnected living quarters shared by him and his parents.

Finally, although "there may be circumstances in which a robber can properly be convicted of kidnaping even though he does not take his victim outside the premises in question" (*People* v. *Timmons* (1971) 4 Cal.3d 411,

415 [93 Cal.Rptr. 736, 482 P.2d 648]), we do not find such circumstances in the within case.

In *Timmons,* the Supreme Court discussed, in detail, factors which would "substantially increase the risk of harm" to a victim so as to trigger the section 209 sanctions. Distinguishing travel in an auto for 5 blocks in a safe manner (*Timmons*) from a high speed chase in the early morning hours (*People* v. *Ramirez* (1969) 2 Cal.App.3d 345 [82 Cal.Rptr. 665]) the court emphasized that the " 'manner of the detention and movement . . .' " would be critical in the *Daniels* analysis. (*People* v. *Timmons, supra,* 4 Cal.3d at p. 415; see also *People* v. *Milan* (1973) 9 Cal.3d 185, 192-193 [107 Cal.Rptr. 68, 507 P.2d 956].)

In this case, while Clyne was initially confronted with an armed assailant, his subsequent treatment was not violent, he was not injured, and he was moved only on foot from place to place on the grounds and within his home while the crime was continued.

The significance of the nature of the asportation is further highlighted by consideration of two additional Supreme Court opinions: *People* v. *Thornton, supra,* 11 Cal.3d 738, and *In re Earley, supra,* 14 Cal.3d 122. These post-*Daniels* section 209 cases were concerned with an analysis of factual underpinnings of *Daniels.* In each case, the majority concluded that both prongs of the *Daniels* text had been satisfied. The victims were forced to travel by automobile driven by their assailants over a distance of several city blocks.

In distinguishing *People* v. *Timmons, supra,* 4 Cal.3d 411[4], the *Earley* court emphasized the distance traveled, the violence, and the use of an automobile driven by the kidnaper with the attendant risk of crash or attempted escape from the moving car, as factors in support of the section 209 sanctions. (*In re Earley, supra,* 14 Cal.3d at p. 132.)

None of these factors is present in this case. Here, all of the movement was at the same location and none of it was physically violent. Moreover, all of the movement was an integral part of the robbery and burglary which occurred. Thus, any movement of Sean Clyne was merely incidental to the robberies and did not substantially increase the risk of harm beyond that

---

[4]The *Earley* court also suggests that *Timmons* was "impliedly overruled" by *People* v. *Thornton, supra,* 11 Cal.3d 738, and *People* v. *Stephens* (1974) 10 Cal. 3d 652 [111 Cal.Rptr. 556, 517 P.2d 820]. (See *In re Earley, supra,* 14 Cal.3d at pp. 131 and 133, fn. 14). Whether this is in fact the case or not appears unclear. Neither *Thornton* nor *Stephens* cited *Timmons.* The *Earley* court cited and distinguished *Timmons* and only Justice Clark, concurring, overtly voted to overrule. (At p. 133.)

inherent in the robberies themselves. (*In re Crumpton, supra,* 9 Cal.3d 463; *People* v. *Morrison, supra,* 4 Cal.3d 442; *People* v. *Smith, supra,* 4 Cal.3d 426; *People* v. *Daniels, supra,* 71 Cal.2d 1119; compare also *People* v. *Lara* (1974) 12 Cal.3d 903 [117 Cal.Rptr. 549, 528 P.2d 365]; *People* v. *Milan, supra,* 9 Cal.3d 185; *People* v. *Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905] [all of which involved use of motor vehicles as the instrument of transportation over substantial distance coupled with physically violent behavior by armed assailants].

■ Following the conviction by the jury, appellant filed a motion for a new trial in which, in part, he urged the trial court to modify such verdict to a conviction of simple kidnaping (§ 207). On appeal he contends in part, "the judgment on [count 3] must be modified to reflect conviction of the lesser included offense of simple kidnaping."

■ It is by now well established, through legislation and case law, that a Court of Appeal has the power to reduce a conviction to a lesser included offense in a proper case. " '. . . Since the amendment of Penal Code section 1181 in 1927, this court is empowered to modify the judgment and fix a lesser degree of the crime in those instances where *on an appraisal of all the evidence* there is found to be lacking any *substantial* evidence of the elements required to constitute the degree of the crime as fixed by the jury. [Citation.]' (Italics added.) [Citation.]" (*People* v. *Bassett* (1968) 69 Cal.2d 122, 137-138 [70 Cal.Rptr. 193, 443 P.2d 777].) This court is equally empowered to reduce the judgment to a conviction of a lesser included offense. (*People* v. *Enriquez* (1967) 65 Cal.2d 746, 749 [56 Cal.Rptr. 334, 423 P.2d 262].)

■ Thus, we now consider whether we may apply the above remedy and reduce the conviction of kidnaping for the purpose of robbery in violation of section 209 to the lesser offense of simple kidnaping in violation of section 207.

While it is true that Clyne was forcibly moved a total maximum distance of 465 feet and that such movement has been found to be substantial in other cases (see *People* v. *Stanworth* (1974) 11 Cal.3d 588, 603 [114 Cal.Rptr. 250, 522 P.2d 1058], [700 feet]; *People* v. *Blackburn* (1976) 56 Cal.App.3d 685, 693 [128 Cal.Rptr. 864], [500 feet]; *People* v. *Stender* (1975) 47 Cal.App.3d 413, 423 [121 Cal.Rptr. 334], [200 feet]), it is to be noted that all of these cases involved separate charges of section 207.[5]

---

[5]The only case applying *Daniels* considerations to a section 207 conviction is *People* v. *Williams* (1970) 2 Cal. 3d 894 [88 Cal.Rptr. 208, 471 P.2d 1008]. In that case, the trial court had reduced the crime "evidently . . . in order to avoid the harsher penalty provision of section 209." (At p. 903). It was that peculiar circumstance which caused the *Williams* court to evaluate the conviction in light of *Daniels*. (*People* v. *Stanworth, supra,* 11 Cal.3d at p. 599, fn. 11.)

The Supreme Court in *Stanworth* held the *Daniels* factors to be inapplicable to the charge of simple kidnaping. (*People* v. *Stanworth, supra,* 11 Cal.3d at p. 599.) The court pointed out that "kidnapping, as defined by such section 207, *may* occur in the absence of another crime." (*Id.,* at p. 600, italics added.) Conceding that an earlier opinion, *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459, 465 [15 Cal.Rptr. 65, 364 P.2d 241], (which involved kidnaping and related charges of rioting and assault), had concluded that the Legislature did not intend to apply the criminal sanctions of section 207 where the "slightest" movement was involved the court held: "In enacting section 207, the Legislature did not provide a definition of kidnaping that involves movements of an exact distance; rather, it defined it in minimum terms as forcible movements 'into another part of the same county.' [Citation.] Indeed, 'to define the phrase, "another part of the same county" in terms of a specific number of inches or feet or miles would be open to a charge of arbitariness . . . . [Nonetheless] [t]he law is replete with instances in which a person must, at his peril, govern his conduct by such non-mathematical standards as "reasonable," "prudent," "necessary and proper," "substantial" and the like.' [Citation.] [¶] . . . [T]he statutory language implies that the determining factor in the crime of kidnaping is the actual distance of the victim's movements; and further, that the minimum movements necessary for the commission of the crime are present where the victim is forcibly taken 'into *another part* of the same county.' Finally, because the victim's movements must be more than slight (citation) or 'trivial' (citation), they must be substantial in character to constitute kidnaping under section 207." (*People* v. *Stanworth, supra,* 11 Cal.3d at pp. 600-601, italics in original.)

The *Stanworth* court further held that the second factor of the *Daniels* rule—an increase in the risk of harm above that present in the underlying crime—likewise did not apply to simple kidnaping, pointing out that kidnaping under section 207 does not, of necessity, occur in connection with another offense, and that the increase in harm factor has its origin in section 209 rather than 207. (*People* v. *Stanworth, supra,* 11 Cal.3d at p. 601.)

In *People* v. *Stender, supra,* 47 Cal.App.3d 413, *Stanworth* and other developments in the law of simple kidnaping were commented upon: "The increasing complexity of the law marches on. What *Stanworth* and *Brown* seem to teach is this: the test of simple kidnaping *is not* (1) whether the movement is incidental to an underlying crime (*People* v. *Stanworth, supra,* 11 Cal.3d at pp. 598, 600); (2) whether there is an increase in the risk of harm above that present in an underlying crime (*People* v. *Stanworth, supra,* at pp. 598, 601); (3) a mathematical formula (*People* v. *Stanworth, supra,* at pp. 600-601); or (4) the crossing of arbitrary boundaries. (*People* v. *Brown, supra,* at p. 789, fn. 6 [114 Cal.Rptr. 426, 523 P.2d 226].) Thus,

we are left to ponder what the movement *is* in simple kidnaping. We are told it 'is the actual distance of the victim's movements' and they must be substantial in character (*People* v. *Brown, supra,* at pp. 798-799, fn. 6; *People* v. *Stanworth, supra,* at p. 601) but, of course, it is not a question of mathematical measurement or crossing of arbitrary boundaries. Thus, we are led in circles. . . . [¶] '[W]e can not conclude as a matter of law from the uncontradicted evidence in the record that defendant did not commit the act of kidnaping when he forced the victims at gun point to walk a distance of one-quarter of a mile. Such a distance can not be regarded as slight or insubstantial.' [Citation.] In *Brown,* the court concluded: 'The asportation of the victim within her house and for a brief distance outside the house must be regarded as trivial'. [Citation.] The distance traversed outside was 75 feet. What is the difference between these cases if all that is *not* to be considered is omitted? This is an apparently hopeless task. [¶] In truth the mathematical differences in distance had to play into the decisions. With this in mind, it can not be said whether 200 feet, standing alone, is trivial or substantial movement. However, this 200 feet becomes more of a sub-stantial distance when it is considered it accomplished the purpose of re-moving the victim from the ready help of her mother. Also, as above in-dicated, the boundaries traversed, the locations involved, suggest that some-thing more than trivial movement here existed. The nonexistence of movement merely incidental to an underlying crime also leads to the con-clusion of substantial rather than trivial movement." (*People* v. *Stender, supra,* 47 Cal.App.3d at pp. 422-423, italics in original, fns. omitted.)

Perhaps bringing this discussion full circle, the Supreme Court in *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], held that the forcible taking of the victim in that case for an unspecified distance from an elevator to a storage room and from the storage to her apartment was not substantial movement within the meaning of section 207, notwith-standing the presence of a sexual assault. The *Caudillo* court held that "it is settled law that the kidnaping offense must involve a movement which is more than that which would be regarded as trivial, slight or insignificant." (*People* v. *Caudillo, supra,* 21 Cal.3d at p. 572, citing *People* v. *Daniels, supra,* 71 Cal.2d 1119; *Cotton* v. *Supreme Court, supra,* 56 Cal.2d 459.) The court distinguished the asportation in *Stanworth* and *Stender* from that in *People* v. *Thornton, supra,* 11 Cal.3d 738, *People* v. *Brown* (1974) 11 Cal.3d 784 [114 Cal.Rptr. 426, 523 P.2d 226] and *Cotton* v. *Superior Court, supra,* 56 Cal.2d 459. (*Caudillo, supra,* 21 Cal.3d at pp. 573-574.)

In addition, the *Caudillo* court rejected a suggestion that *Stender* authorizes consideration of factors other than actual distance as determinative of what constitutes efficient movement of a victim to constitute the offense of kid-naping pursuant to section 207. (*People* v. *Caudillo, supra,* 21 Cal.3d at

p. 574.) Caudillo's conviction for simple kidnaping was reversed for lack of evidentiary support. (*Id.*, at p. 575.)

In this case, while the distance exceeds *Stender,* there is no evidence of any movement which was not merely incidental to (and in fact necessary to) the commission of the robberies and burglaries. In this regard, we note *People* v. *Ungard* (1971) 4 Cal.3d 420 [93 Cal.Rptr. 741, 482 P.2d 653], in which it was held, as a matter of law, that movement by Ungard and his companion, of a man, his wife and daughter within their home "to various rooms *in search of valuables*" was within the *Daniels* limitation with respect to both prongs of that test. (At p. 421, italics added.)

■ ■ While it is generally true that "[s]imple kidnaping is a lesser offense included within the crime of kidnaping with the intent to commit robbery [citation]", (*People* v. *Bailey* (1974) 38 Cal.App. 3d 693, 699 [113 Cal.Rptr. 514]) it is also true that, where the evidence establishes that if the defendant is guilty at all, he is guilty of the greater offense, the trial court need not, even if requested, instruct the jury on the existence of any lesser and included offenses. (*People* v. *Hulderman* (1976) 64 Cal.App.3d 375, 379 [134 Cal.Rptr. 223].) ■ In this case the principles of *Hulderman* control. Since all of the movement in this incident has been determined to have been merely incidental to the robbery (and inadequate to trigger the section 209 sanctions) an instruction on simple kidnaping would have been inappropriate. For the same reason, reduction of appellant's conviction to a violation of section 207 is unwarranted.

Appellant's assertion that he was denied adequate assistance of counsel for failure to request such an instruction therefore need not be discussed. We hold, on the facts presented here, that there is lack of evidentiary support for either a section 209 conviction or section 207 conviction. (*People* v. *Caudillo, supra,* 21 Cal.3d 562; *People* v. *Daniels, supra,* 71 Cal.2d 1119; *People* v. *Stender, supra,* 47 Cal.App.3d 413.)

### B. *Aiding and Abetting Instructions*

■ Appellant contends "the entire judgment must be reversed because delivery of CALJIC Nos. 3.00 and 3.01 removed from the jury's consideration any determination of whether appellant possessed the necessary element of criminal intent on all three counts."

This contention lacks merit because we conclude that the instructions as a whole in this case (*People* v. *Johnson* (1980) 104 Cal.App.3d 548, 603 [164 Cal.Rptr. 69]), where appellant was tried alone, informed the jury that he could not be found guilty unless he had the intent to aid in the commis-

sion of a kidnaping, robbery, and burglary. The jury was instructed with CALJIC No. 1.01 (instructions to be considered as a whole); CALJIC No. 2.02 (sufficiency of circumstantial evidence to prove specific intent); CALJIC No. 2.90 (presumption of innocence—reasonable doubt—burden of proof); CALJIC No. 3.00 (principals—defined); CALJIC No. 3.01 (aiding and abetting—defined); CALJIC No. 3.31 (concurrence of act and specific intent); CALJIC No. 3.34 (how intent is shown); CALJIC No. 9.10 (robbery—defined, including intent element); CALJIC No. 14.50 (burglary—defined, including intent element; CALJIC No. 9.23 (kidnaping to commit robbery—defined, including intent element; and, CALJIC No. 9.60 (false imprisonment by violence or menace—defined, including intent element). Since appellant was tried alone, we find that the jury was effectively told that the criminal intent instructions were to be applied to him. The jury was clearly informed that they could not convict appellant unless he acted with criminal intent.

## C. *The Sentencing Error*

■  Appellant complains that he was sentenced in violation of section 654 which forbids multiple punishment where the record shows that two crimes "were part of an indivisible course of conduct directed to the objective of committing the lesser of the crimes." (*People* v. *Beaumaster* (1971) 17 Cal.App.3d 996, 1008 [95 Cal.Rptr. 360].) The Attorney General concedes that the facts in this case establish an indivisible course of conduct on the part of appellant directed toward the objective of robbing Sean Clyne. Since the judgment of conviction for violation of section 209 must be reversed, the matter will be remanded for resentencing consistent with this concession, the provisions of section 654 and the holding of *Beaumaster*, on the remaining convictions of violating sections 211 and 459 (counts 1 and 2 of the original information).

The judgment is reversed with respect to the conviction for violation of section 209 (count 3) and affirmed in all other respects. The matter is remanded to the trial court with directions to pronounce judgment and sentence as provided by law and in accordance with the views expressed herein.

Certified for publication.

Caldecott, P. J., and Poché, J., concurred.

On January 4, 1984, the opinion was modified to read as printed above.