Filed 12/22/25  P. v. Kern CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES CURTIS KERN,<br><br>Defendant and Appellant. | C100646<br><br>(Super. Ct. No. 22FE016826) |

A jury found defendant James Curtis Kern guilty of kidnapping to commit robbery, assault with the intent to commit rape, robbery, attempted robbery, and misdemeanor petty theft.  On appeal, Kern asserts the judgment should be reversed because the trial court prejudicially erred when it removed a juror for refusing to deliberate, and the kidnapping to commit robbery conviction should be reversed because there was no substantial evidence to support a finding of asportation.  Kern further requests that we correct a clerical error in the abstract of judgment.

We agree with Kern that the record lacks substantial evidence of asportation and reverse the kidnapping to commit robbery conviction. In all other regards, we affirm the judgment. Because we remand the matter for resentencing, we do not address the asserted clerical error in the abstract of judgment.

## BACKGROUND

Kern was charged with and found guilty of crimes committed at three different massage establishments. The prosecution also introduced testimony pertaining to uncharged conduct.[1]

### I

*The Robbery and Related Crimes*

*M.D.'s Testimony*: On September 14, 2022, M.D. was working at a massage establishment when Kern entered and asked the price for a massage. Kern gave M.D. $40 for a 30-minute massage and she took him into a room, explaining she would be back after he undressed. When M.D. returned to the room, Kern was still dressed, with his shirt pulled up halfway to his shoulders. M.D. asked Kern why he was not ready and he responded by asking M.D. whether she provided sexual services. M.D. said "no" and asked Kern to leave.

M.D. returned the $40 Kern had given her and they walked toward the front door. Kern said his lower back hurt and he wanted an hour-long massage but needed to leave to get the additional $20. Kern left and later returned. M.D. started to walk Kern back to the room that he was originally in when Kern pushed her against the wall with one hand on her neck and the other hand bending her arm behind her back. M.D. told Kern not to hurt her and said she would give him money if he wanted it. Kern pushed or dragged M.D. toward the breakroom at the end of the hallway, which did not have a window.

---

[1] Because Kern's identity as the perpetrator is not at issue, we do not set forth the evidence pertaining to identification.

M.D. confirmed, however, that none of the massage rooms had windows; there were only windows at the front entrance.

Kern told M.D. to turn on the light and give him her handbag. M.D. handed the bag to Kern, and he removed the money from her wallet. Kern said the money was not enough and ordered M.D. to find more. M.D. responded that the money in her wallet was all she had. Kern then pushed M.D. against the wall and "started to touch [her] all over," kissing her neck, grabbing her breast, touching her vagina, and rubbing his body against hers. Kern asked for a condom and M.D. responded that she did not have one.

M.D. grabbed a knife, held it to her neck, and told Kern he would have to kill her if he wanted sex. Kern took the knife from her and ran out the front door with her keys and cash when she tried to take the knife back.

The prosecution played a surveillance video from that evening for the jury. The prosecution also played a video taken at the massage establishment during M.D.'s police statement, which showed the layout of the business.

*Surveillance Video*: The surveillance video shows that, after Kern left the massage establishment the first time to get more money, another customer entered and asked for a massage. M.D. told the customer that she did not have enough time for a massage, and the customer left. M.D. switched off the lobby light and closed the curtains on both sides of the front door such that all windows were covered by curtains except for the glass door, which appears to have been across from a wall with windows in the lobby. M.D. briefly walked outside and then switched the lobby light back on when she returned. Kern came through the front door and M.D. seemingly locked the door behind him.[2]

---

[2] M.D. testified she did not lock the door. She said the door was hard to pull, and she was pulling it tighter.

3

M.D. and Kern walked down the hallway and outside of the camera's view, but the audio could still be heard. Kern yelled at M.D. "to go back in the back." M.D. asked Kern if he was going to hurt her and he responded, "I'm not going to hurt you at all." Kern repeated for M.D. to "[g]o in the back" and asked, "You have the money in here?" M.D. responded, "I have over here." Kern then instructed M.D. to turn on the lights. M.D. asked Kern why he wanted to go "over there" and said, "You want the money, I give you the money!" Kern repeated his directive for M.D. to turn on the lights and M.D. reiterated, "I give all the money here. Right here." Kern responded, "That's not all the money?" M.D. replied, "Yes, that all. I don't have business today." Kern said, "Man, there's more in here." When M.D. said, "You have to kill me for that if you want more," Kern asked: "Come on where is it? Where is more?" M.D. again reiterated, "I don't have more." Kern and M.D. continued to discuss money and then Kern asked M.D. if she had a condom. M.D. responded she did not have a condom and Kern would have to kill her if he wanted "to do this." After further back and forth between M.D. and Kern, Kern told M.D. to "get back there in the back" and wait there until he walked out. M.D. told Kern the front door was locked. It appears that Kern unlocked the front door when he left, seemingly struggling with the lock.

*Video of the Establishment*: While M.D. was testifying, the prosecution played a video taken by a police officer during M.D.'s statement. The video showed the layout of the business. At the entry, there was a wall with windows and a door to a room from the side. To the right of the front room, offset further to the back, was a hallway. It does not appear that the hallway would have been visible from the front door. M.D. took three steps into the hallway and stopped by a door. M.D. testified that they "weren't quite at this door yet" when Kern pushed her up against the wall in the hallway. The video then shows M.D. walking down the hallway to the end. It took M.D. approximately 11 seconds to get to the breakroom, with M.D. briefly stopping at one point to show the officer something. The breakroom had a dark curtain drawn at the entrance.

4

## II

### *The Misdemeanor Theft*

In August 2022, Q.Z. was working at a massage establishment in the evening when Kern entered the business and asked for a massage. Because both employees were busy with other customers, Kern went to a room and waited. After Kern had waited for a few minutes, Q.Z. heard him walking around and noticed that he was leaving. She asked him why he was leaving but Kern "dashed out." Q.Z. went to the breakroom and noticed the $150 that had been sitting on the desk was missing.

## III

### *The Attempted Robbery*

On September 18, 2022, L.D. was working at a massage establishment. After she led Kern to a massage room, Kern reemerged and asked for his money back. He took back his $60 and also took L.D.'s cell phone. After Kern and L.D. struggled and Kern hit L.D. in the face, Kern threw the cell phone back at L.D. and left the business.

## IV

### *Uncharged Conduct*

The prosecution introduced testimony pertaining to uncharged conduct. G.T. testified that she was working at a massage establishment in July 2022 when she was the victim of theft. G.T. led Kern to an empty room because she was finishing up another massage. After a few minutes, G.T. heard Kern leave the room. She asked Kern what he was doing, and he indicated that he needed to use the restroom. G.T. showed him to the restroom and told him to return to the massage room when he was done. Kern later came out of the room and said he had an emergency and needed to leave. When G.T. reviewed the surveillance video, it showed Kern going into the breakroom and taking her money. He took approximately $1,100.

# DISCUSSION

## I

### *The Kidnapping to Commit Robbery Conviction Is Reversed*

Kern argues his kidnapping to commit robbery conviction must be reversed because the record lacks substantial evidence to support a finding of asportation. Specifically, he argues the evidence is insufficient because (1) the movement of M.D. down the hallway to the breakroom was incidental to the underlying robbery; and (2) the movement did not increase the risk of harm to M.D. over and above the risk already present in the robbery. The People disagree.

The People assert the asportation element was met because the surveillance video showed the business "had large windows and a glass door" and, "[r]ather than simply taking M.D.'s purse from her person in the lobby, [Kern] made a conscious decision to force M.D. out of the public area of the [business], as far as possible from any public view." The People argue the movement "decreased the possibility of detection, escape, or rescue, and increased the risk of harm to M.D," supporting the finding of asportation.

"The test on appeal for determining if substantial evidence supports a conviction is whether ' "a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt." ' [Citation.] In making this determination, we ' "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Rayford* (1994) 9 Cal.4th 1, 23.) We conclude there is insufficient evidence to support the kidnapping to commit robbery conviction and thus reverse.

A "person who kidnaps or carries away an individual to commit robbery" is guilty of kidnapping for robbery. (Pen. Code, § 209, subd. (b)(1).)[3] There are two requirements for how the victim must be moved. (*Id.*, subd. (b)(2); *People v. Daniels* (1969) 71 Cal.2d 1119, 1139 (*Daniels*).) First, the movement must be "beyond that merely incidental to the commission of" the intended robbery. (§ 209, subd. (b)(2).) Second, the movement must "increase[] the risk of harm to the victim over and above that necessarily present in" the intended robbery. (*Ibid.*)

"With regard to the first prong, the jury considers the 'scope and nature' of the movement, which includes the actual distance a victim is moved." (*People v. Vines* (2011) 51 Cal.4th 830, 870 (*Vines*).) Also relevant is the "context of the environment in which the movement occurred." (*People v. Rayford*, *supra*, 9 Cal.4th at p. 12.) There is "no minimum distance a defendant must move a victim to satisfy the first prong." (*Vines*, at p. 870.) Application of the first prong is a "multifaceted, qualitative evaluation rather than a simple quantitative assessment." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.)

For the second prong, relevant factors include "the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes." (*Vines*, *supra*, 51 Cal.4th at p. 870.) Another factor is the risk of "unforeseen intervention by third parties." (*People v. Lara* (1974) 12 Cal.3d 903, 908, fn. 4.) That " ' "these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." ' " (*Vines*, at p. 871; see also *People v. Williams* (2017) 7 Cal.App.5th 644, 667.)

" 'In the vast majority of cases, the increased risk of harm to the victim is a risk of physical harm.' " (*People v. Leavel* (2012) 203 Cal.App.4th 823, 834.) But the second

---

[3] Undesignated statutory references are to the Penal Code.

prong may also be satisfied by an increased risk of mental, emotional, or psychological harm.  (*People v. Nguyen* (2000) 22 Cal.4th 872, 885-886; *Leavel*, at p. 834.)  Put differently, the word "harm" in section 209 includes "mental suffering."  (*Nguyen*, at p. 885.)

The two prongs "are not mutually exclusive but are interrelated."  (*Vines*, *supra*, 51 Cal.4th at p. 870.)  The factual question of whether a victim's forced movement was merely incidental to the robbery "is necessarily connected to whether it [] increased the risk to the victim."  (*People v. Dominguez*, *supra*, 39 Cal.4th at p. 1152.)  "[E]ach case must be considered in the context of the totality of its circumstances."  (*Ibid*.)

In *Daniels*, our Supreme Court observed that "when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence . . . or a place of business or other enclosure—his conduct generally will not be deemed to constitute the offense proscribed by section 209.  Movement across a room or from one room to another, in short, cannot reasonably be found to be asportation 'into another part of the same county.' "  (*Daniels*, *supra*, 71 Cal.2d at p. 1140.)

In that case, the defendants gained entry to the homes of three women.  On one occasion, the defendants "walked [a victim] quickly through the dining room into the kitchen, a distance of approximately 18 feet," where they demanded cash.  (*Daniels*, *supra*, 71 Cal.2d at p. 1123.)  She told them to look in her purse, where she had no cash.  (*Ibid*.)  On another occasion, a defendant demanded money from the victim, and she walked five or six feet to a table holding her purse and gave him cash.  (*Id.* at p. 1124.)  On the third occasion, a defendant walked the victim "first towards the kitchen and then towards the bedroom to see if anyone was there.  He then sat her down on the bed and asked for her money.  The distance that the parties had covered was about 30 feet." (*Ibid*.)  Our Supreme Court found the "brief movements" insufficient to support the asportation element of kidnapping to commit robbery because the movements were

8

"merely incidental" to the robberies and did not substantially increase the risk of harm otherwise present. (*Id*. at p. 1140.)

"Most movements that have been found to be insubstantial or merely incidental to the underlying crime have been within a building [citations], or within the premises of a business." (*People v. Power* (2008) 159 Cal.App.4th 126, 139; see, e.g., *People v. Morrison* (1971) 4 Cal.3d 442, 443 [movement up and down stairs and into various rooms of residence incidental to robbery]; *People v. Smith* (1971) 4 Cal.3d 426, 427 [movement of a hotel clerk about an office and then to a second floor room insufficient to sustain a conviction for kidnapping for the purpose of robbery]; *People v. Killean* (1971) 4 Cal.3d 423, 424 [movement of victims across apartment threshold and through several rooms looking for valuables was incidental to robbery]; *People v. Adame* (1971) 4 Cal.3d 417 [movement of supermarket employees from check stand and manager's office to the safe was incidental to robbery]; *People v. Mutch* (1971) 4 Cal.3d 389, 397-399 [movement of 30 to 40 feet in a business establishment from one room to another room where the safe was located was incidental to robbery]; *People v. Williams* (1970) 2 Cal.3d 894, 902-904 [movement of gas station attendant from cash register to locked bathroom and then around premises was incidental to the robbery]; *People v. John* (1983) 149 Cal.App.3d 798, 805 [movement of 465 feet inside "interconnected living quarters shared by [victim] and his parents" was incidental to robbery]; *People v. Washington* (2005) 127 Cal.App.4th 290, 299 [movement of bank tellers was "entirely within the premises of the bank" and thus incidental to robbery].) "The rule to be derived from these cases is that robbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises." (*Washington*, at p. 300.)

The rule applies here. When the robbery started in the hallway, M.D. had closed the curtains in the lobby, and it did not appear that the hallway was within view from the front door because the front door was across from a wall to another room and the hallway

9

was offset to the right. Accordingly, when the robbery started, it appears no one could see Kern and M.D. in the hallway. The surveillance video also appears to show that M.D. locked the front door in Kern's presence, and she later told Kern that the door was locked. Thus, there was no apparent risk of detection. Kern then moved M.D. down the hallway within the business toward the breakroom while asking M.D., "You have the money in here?" When M.D. offered her purse, Kern asked for more money and said, "Man, there's more in here." Kern's focus on the breakroom was consistent with his actions in the misdemeanor theft and uncharged conduct cases, where he stole money from breakrooms at other massage establishments. Taken together, the evidence shows that one of Kern's main objectives during the robbery was to search the breakroom. Additionally, although it is unclear how far Kern moved M.D. from the beginning of the robbery to the breakroom,[4] the police video of M.D.'s statement shows that it would have taken no more than 11 seconds. These facts are similar to the facts in the plethora of cases identified *ante*, in which movement within the building or within the premises of a business during a robbery was found insufficient to support the asportation element of kidnapping to commit robbery.

The People cite two cases in support of their argument: *People v. James* (2007) 148 Cal.App.4th 446 and *People v. Williams*, *supra*, 7 Cal.App.5th 644. The People do not explain or provide any reasoned argument as to the purported application of these cases to the facts at hand. Our review of the cases indicates that neither of them leads to a contrary conclusion. (*James*, at pp. 449-457 [over the course of an hour, the victim was

---

[4] The People rely on the prosecutor's closing argument that the distance from the lobby to the breakroom was 50 to 60 feet. An attorney's argument is not evidence. (*Villacorta v. Cemex Cement, Inc.* (2013) 221 Cal.App.4th 1425, 1433.) The trial court specifically noted the absence of such evidence during jury deliberation in discussing a question by the jury. The trial court believed the distance was no "more than 15 feet" based on the video.

moved from a parking lot to a bingo club, thrown on the floor, and then confined to a bathroom]; *Williams*, at pp. 671-672 [simple kidnapping reversed where robbers moved a security guard and employee approximately 50 feet from the front to the back of the store and took one employee to the adjoining vault room to open safes].)

The People appear to argue that Kern's movement of M.D. to a room in the back without windows increased her risk of harm and decreased possible detection. The problem with this argument is that it appears the hallway could not be seen from the front door and the curtains on the other windows were closed, the front door appears to have been locked, none of the massage rooms had windows, and there were no other employees or customers in the building. We thus find the People's argument unpersuasive.

Because the movement of M.D. occurred within the building where the robbery occurred, and Kern merely moved her to a different room where he believed cash would be located, the movement was incidental to the robbery. We accordingly reverse the kidnapping to commit robbery charge for lack of substantial evidence and remand the matter for resentencing.

II

*The Trial Court Did Not Err in Discharging Juror No. 11*

Kern argues the trial court prejudicially erred in discharging Juror No. 11 because the trial court relied on the opinions of jurors obtained through leading questions and there was insufficient evidence for the discharge. The People disagree. We conclude the trial court did not err.

A.    *Additional Factual Background*

The jury started deliberation on February 1, 2024, at 10:13 a.m. At around 3:00 p.m. that day, the trial court received a note from the jury that it had come to an agreement on two counts but was unable to agree as to the remaining three counts. The trial court called the jury in and indicated to Juror No. 11, the foreperson, that it would be

11

asking questions but admonished the juror not to provide information about the jury's deliberation. In starting to ask a question about the three counts for which no agreement had been reached, the court expressly told Juror No. 11 that it did not want to know the "split" of the jury's votes. Juror No. 11 nonetheless interrupted the trial court and said the split was 11 to one.

The trial court repeated that it specifically said not to advise the court of the votes. The trial court detailed options to provide the jury with additional information. The court asked Juror No. 11, as the foreperson, whether any of the suggestions might assist the jury in reaching a verdict. The juror responded in the affirmative. The court instructed the jurors to exit the courtroom to deliberate and provide questions for further information. The jury later submitted several questions, which the trial court answered. The following day, at 11:18 a.m., the trial court learned the jury was at an impasse. The trial court then provided further instructions to the jury.

That afternoon, the trial court advised the parties that a juror was requesting to be excused due to work obligations. The parties did not object.

On February 5, 2024, at 9:15 a.m., the trial court seated an alternate juror and instructed the jury with CALCRIM No. 3575 to disregard prior deliberation and start deliberation anew. The jury exited the courtroom to start deliberations at 9:19 a.m. At 10:30 a.m., Juror No. 11 submitted a jury question form asking to be excused from the jury. The trial court responded by asking Juror No. 11 to be more specific as to the basis for his request. Also at 10:30 a.m., the jury asked whether it could consider lesser charges if the jurors could not agree on guilt or innocence on the "primary charges." The trial court responded and at 12:02 p.m. the jury advised that it had a new foreperson—Juror No. 4.

At 3:15 p.m., the trial court received two questions from the jury. First, the jury requested to hear additional argument as to the kidnapping to commit robbery charge. Second, Juror No. 4 wrote: "I'm concerned I'm not hearing all of the deliberating due to

12

a juror having difficulty re-setting. He refuses to explain his opinions, because he already did so last week." In response, the trial court noted that it had received communication from Juror No. 11 earlier that day, requesting to be excused from the jury. To clear up any potential confusion, the trial court called Juror No. 4 to discuss his question.

The trial court asked Juror No. 4 to identify the juror referenced in his jury question. Juror No. 4 identified Juror No. 11. The trial court thereafter separately asked Juror Nos. 2, 5, 9, 10, and 12 whether Juror No. 11 was failing or refusing to deliberate; all of them responded in the affirmative.

The trial court next called Juror No. 11 and told him that it had been reported by six jurors that he was not following the instruction to begin deliberations anew. The trial court asked Juror No. 11 if this was true. The juror said it was incorrect, stating: "I've had to explain my position repeatedly to them, and they get up and scream at me when they don't like it." The trial court asked Juror No. 11 whether he informed the other jurors that he did not need to explain his position because he did so the prior week. Juror No. 11 said he did not. The trial court asked Juror No. 11 to take a seat outside and asked counsel whether they wanted to be heard. The prosecution argued that excusal of Juror No. 11 was warranted; the defense disagreed, arguing for the trial court to remind the jury that everyone's opinion carries equal weight.

The trial court next called in Juror Nos. 3, 6, and 8, respectively and asked each of them whether Juror No. 11 was failing or refusing to deliberate. Juror Nos. 3 and 6 responded in the affirmative. Juror No. 8 responded: "I think that that juror kind of refuses to do a lot of things. I don't know if he necessarily refused to follow those instructions. I think sometimes it seems as if he's confused about the instructions, if that makes sense to you." The trial court asked Juror No. 8 whether Juror No. 11 said he did not want to explain his opinions because he had already done so the prior week. Juror No. 8 replied, "Yes."

The trial court removed Juror No. 11 for refusing to deliberate. The trial court explained nine jurors had indicated that Juror No. 11 failed or refused to follow the instruction to start deliberations anew and two jurors had indicated that Juror No. 11 said he did not want to explain his opinions because he had already done so the week prior. The trial court noted that Juror No. 11 denied the statement, and then it made a credibility finding—Juror No. 11 was not credible and was lying to the court, and the other jurors were credible. The trial court said it "seem[ed] obvious" considering that Juror No. 11 requested to be excused from the jury at 10:30 a.m. that morning, which was "highly unusual," and that he was later replaced as the jury foreperson. The trial court further said it appeared Juror No. 11's prior failure to follow instructions was "borderline deliberate" when he revealed "how the jury was split." The trial court found that Jury No. 11's refusal and failure to deliberate as directed by the court was a failure to follow instructions.

B.    *The Trial Court's Reasons for Discharging Juror No. 11 are Supported by the Record to a Demonstrable Reality*

Under section 1089, "[a] trial court may discharge a juror at any time during trial if the court finds that the juror is 'unable to perform his or her [or their] duty.' [Citation.] A juror who refuses to deliberate may be removed 'on the theory that such a juror is "unable to perform [a juror's] duty" within the meaning of [section 1089].' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 450; see *People v. Cleveland* (2001) 25 Cal.4th 466, 475 (*Cleveland*).)

" 'A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, [the juror] will not participate in discussions with fellow jurors by listening to their views and by expressing [the juror's] own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the

14

jury.' " (*People v. Barton* (2020) 56 Cal.App.5th 496, 510-511 (*Barton*), quoting *Cleveland*, *supra*, 25 Cal.4th at p. 485.)

A trial court's decision to discharge a juror pursuant to section 1089 is reviewed for abuse of discretion under a " 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' " (*People v. Armstrong*, *supra*, 1 Cal.5th at p. 450.) "[T]he juror's 'inability to perform' his or her [or their] duty 'must appear in the record as a demonstrable reality.' " (*Ibid.*) This standard is " 'more comprehensive and less deferential' " than the substantial evidence standard of review. (*Ibid.*) Instead of examining the record to determine whether there was reasonable, credible evidence of solid value upon which the trial court could have relied, we look at the evidence upon which the trial court relied to determine whether it supports the trial court's conclusion in light of the entire record. (*Id.* at pp. 450-451; *People v. Jones* (2020) 50 Cal.App.5th 694, 701.)

" 'As [our Supreme Court has] consistently cautioned, however, even under the demonstrable reality standard the reviewing court does not reweigh the persuasive value of the evidence.' [Citation.] '[E]ven when there is conflicting evidence . . . an appellate court must recognize that it is for the trial court to "weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings," and the reviewing court must "defer to factual determinations based on these assessments." ' [Citation.] Accordingly, reviewing courts must defer to the trial court's assessments of a juror's credibility or mental and physical conditions, 'based "on firsthand observations unavailable to us on appeal." ' " (*Barton, supra*, 56 Cal.App.5th at pp. 509-510, italics omitted.)

Kern argues the trial court erred by discharging Juror No. 11 because the trial court relied on: (1) the other jurors' opinions that Juror No. 11 was not deliberating; and (2) confirmation by two jurors that Juror No. 11 stated that he did not have to explain his

opinions, because he had already done so the week prior. As to the two jurors' statements that Juror No. 11 said he would not explain his opinions, Kern asserts the statements were inconsistent because Juror No. 4 wrote that Juror No. 11 refused to explain his opinions and the trial court asked Juror No. 8 whether Juror No. 11 said he did not want to explain his opinions. We find the distinction that Kern seeks to draw between "refused to" and "did not want to" to be immaterial. Both statements indicate that Juror No. 11 declined to reiterate his opinions that he had previously shared *after* the trial court's instruction to begin deliberation anew.

Turning to the jurors' statements that Juror No. 11 refused to deliberate, it appears that Kern relies on *Barton* for the proposition that the trial court's reliance on the jurors' opinions cannot support a conclusion that the trial court's reasons for discharging the juror is supported by the record to a demonstrable reality. *Barton*, however, is distinguishable.

In *Barton*, the appellate court faulted the trial court for permitting counsel to lead the questioning of jurors and for giving undue weight to the other jurors' opinions that a juror had failed to deliberate, as opposed to focusing on the juror's actual conduct. (*Barton*, *supra*, 56 Cal.App.5th at pp. 511-512.) The other jurors told the trial court when describing the discharged juror's participation in deliberations that she would not talk openly and freely but would share her opinions, appeared to be considering other opinions but would not provide reasons for her own opinions, would answer questions unsatisfactorily or repeat the answer over and over again, referenced her notes and other evidence, and was not acting reasonably. (*Id.* at pp. 504-507.) The appellate court interpreted the record to reveal that the jurors merely disagreed with the discharged juror's ultimate opinion regarding the evidence. (*Id.* at pp. 512-513.) Their opinion as to the discharged juror's purported lack of deliberation was accordingly insufficient to support the trial court's finding by a demonstrable reality.

16

This case differs from *Barton*. We disagree with Kern's assertion that the trial court improperly substituted the jurors' opinions for its own findings of fact. Kern fails to mention that the trial court also relied on other facts in making its determination—its own observations regarding Juror No. 11's prior failure to follow instructions and his request, on the morning he was replaced as foreperson, to be excused from the jury, at which time the lack of deliberation issue arose. The two jurors' statements that Juror No. 11 said he refused to and did not want to repeat what he had said the week prior was not a statement of opinion but rather a statement of fact—either he said it, or he did not. The trial court found the two jurors credible, meaning that the trial court found as a matter of fact that Juror No. 11 made the statement.

In his reply brief, Kern repeatedly cites to and quotes from *People v. McGhee* (2025) 17 Cal.5th 612. Kern does not, however, explain, with reasoned argument, how that case applies to the facts of this case. The facts in *McGhee* are very different from those here. In that case, the jurors said the discharged juror had been deliberating for three days and shared reasons for his views, but he did not make sense and was irrational and the jurors were frustrated with his views on the evidence. (*Id.* at pp. 633-635.) Some of the jurors said the deliberation was going well and that they perceived no bias from the discharged juror. (*Id.* at p. 624.) Our Supreme Court found that the jurors' opinions regarding the discharged juror merely showed that they disagreed with his views, and the trial court's reliance on those accusations was not well-founded in discharging the juror. (*Id.* at pp. 635, 637.) The facts here are plainly distinguishable, as explained *ante*.

Further, nothing in *McGhee* supports Kern's argument that the trial court's credibility finding as to Juror No. 11 was erroneous. The trial court did not rely on the other jurors' opinions, as Kern suggests. The trial court asked Juror No. 11 questions and relayed its own experience regarding its interaction with that juror. As the People correctly point out, we defer to the trial court's credibility determinations. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.)

17

In sum, the trial court's ruling was based on: (1) the court's observation of Juror No. 11's prior failure to follow instructions; (2) Juror No. 11's request to be excused from the jury; (3) the finding that Juror No. 11 was not credible; (4) the finding that Juror No. 11 told other jurors he would not explain his opinions again despite the trial court's deliberation instruction (*Cleveland*, *supra*, 25 Cal.4th at p. 485 [a refusal to speak with other jurors regarding differing points of view constitutes a refusal to deliberate]); and (5) the other jurors' opinions that Juror No. 11 was not deliberating. We conclude the trial court's reasons are supported by the record and show to a demonstrable reality that the discharged juror was unable to fulfill his duties as a juror because he failed to follow instructions.

## DISPOSITION

The judgment on the kidnapping to commit robbery conviction is reversed and the matter is remanded for resentencing. The judgment is otherwise affirmed.


        /s/
        BOULWARE EURIE, J.



We concur:


      /s/
DUARTE, Acting P. J.


      /s/
KRAUSE, J.


18